[991 NE2d 204, 969 NYS2d 430]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JAMES E. GUILFORD, Appellant.

Argued April 25, 2013; decided June 4, 2013

## POINTS OF COUNSEL

*Hiscock Legal Aid Society,* Syracuse (*Piotr Banasiak* of counsel), for appellant. I. James E. Guilford's statements were involuntary and obtained in violation of due process because eight hours in a jail holding cell and two hours with an attorney could not dissipate the debilitating effects of a 50-hour interrogation conducted by rotating teams of detectives, 70 hours without sleep, and 40 hours without food. (*Ashcraft v Tennessee,* 322 US 143; *People v Anderson,* 42 NY2d 35; *Blackburn v Alabama,* 361 US 199; *Miranda v Arizona,* 384 US 436; *Chambers v Florida,* 309 US 227; *Dickerson v United States,* 530 US 428; *People v Valerius,* 31 NY2d 51; *People v Ruppert,* 26 NY2d 437; *Mincey v Arizona,* 437 US 385; *Missouri v Seibert,* 542 US 600.) II. The lower court committed reversible error by denying James E. Guilford's request for a voluntariness instruction on the basis that the evidence did not support such a charge. (*Mincey v Arizona,* 437 US 385; *People v Cefaro,* 23 NY2d 283; *People v Graham,* 55 NY2d 144; *Stein v New York,* 346 US 156; *People v Mezon,* 80 NY2d 155; *People v Prado,* 4 NY3d 725; *People v Florestal,* 53 AD3d 164; *People v Luis,* 189 AD2d 657; *People v Casiano,* 123 AD2d 712; *People v Glover,* 57 NY2d 61.) III. James E. Guilford was deprived of his right to the effective assistance of counsel. (*Strickland v Washington,* 466 US 668; *Hill v Lockhart,* 474 US 52; *Murray v Carrier,* 477 US 478; *United States v Cronic,* 466 US 648; *People v Ennis,* 11 NY3d 403; *People v*

*Baldi*, 54 NY2d 137; *People v Turner*, 5 NY3d 476; *People v Benevento*, 91 NY2d 708; *People v Hobot*, 84 NY2d 1021; *People v Caban*, 5 NY3d 143.)

*William J. Fitzpatrick, District Attorney*, Syracuse (*James P. Maxwell* and *Victoria M. White* of counsel), for respondent. I. The hearing court properly found that defendant's March 23, 2007 statements were admissible at trial. (*People v Scott*, 86 NY2d 864; *People v Holland*, 18 NY3d 840; *People v Gray*, 86 NY2d 10; *People v Hawkins*, 11 NY3d 484; *People v Mateo*, 2 NY3d 383; *People v Smith*, 275 AD2d 951, 96 NY2d 739; *People v Chapple*, 38 NY2d 112; *People v Bethea*, 67 NY2d 364; *People v Bradford*, 15 NY3d 329; *People v Conyers*, 68 NY2d 982.) II. Defendant was not entitled to a voluntariness instruction. (*People v Mateo*, 2 NY3d 383; *People v Cefaro*, 23 NY2d 283.) III. Defendant received effective assistance of counsel. (*People v Stultz*, 2 NY3d 277; *People v Baldi*, 54 NY2d 137; *People v Rivera*, 71 NY2d 705; *People v Droz*, 39 NY2d 457; *People v Bennett*, 29 NY2d 462; *People v Borrell*, 12 NY3d 365; *People v Satterfield*, 66 NY2d 796; *Strickland v Washington*, 466 US 668; *People v Harris*, 131 AD2d 142; *People v Session*, 34 NY2d 254.)

## OPINION OF THE COURT

Chief Judge LIPPMAN.

Defendant appeals from an order of the Appellate Division affirming a judgment convicting him of murder in the second degree. The uncontested circumstance at the root of this appeal is that, before confessing to a detective that he had killed his former paramour, Ms. Nugent, defendant was subjected to a custodial interrogation lasting 49½ hours. It is not now suggested that this evidently uniquely lengthy interrogation was proper, or that the trial court erred when it granted defendant's pretrial suppression motion to the extent of deeming inadmissible the statements made in its course on the ground, among others,[1] that they had been "involuntar[y] . . . in the 'traditional due process sense'." The question posed is rather whether the exclusionary consequence of this marathon interrogation was correctly limited by the trial court to the statements made during the interrogation itself, or whether defendant's suppression

---

1. They were also suppressed as having been obtained in violation of CPL 60.45, defendant's *Miranda* rights (which were read to defendant only once, at the lengthy interrogation's outset) and, with respect to one statement made in response to a question posed after defendant had requested but had not yet been furnished an attorney, in violation of his right to counsel.

motion should have been granted to the further extent of suppressing his subsequent inculpatory statements.

The Appellate Division held that defendant's subsequent statements, the first and most significant of which—"I killed her"—was made some 10 hours after the 49½-hour interrogation had concluded and in the presence of appointed counsel, had been shown sufficiently attenuated from the prior interrogation to permit the conclusion that they were not the product of official compulsion (96 AD3d 1375, 1377 [2012]). Two Justices disagreed, noting their view that neither the break in questioning nor the entry of counsel satisfied the People's burden to prove that the coercive effects of the interrogation had been neutralized so as to return defendant "in effect, to the status of one who is not under the influence of questioning" (*id.* at 1384 [Lindley and Martoche, JJ., dissenting], quoting *People v Chapple*, 38 NY2d 112, 115 [1975]). One of the dissenting Justices granted defendant permission to appeal, and we now reverse and direct a new trial.

## I.

It was, of course, the People's burden to prove the voluntariness of defendant's statements beyond a reasonable doubt as a condition of their receipt at trial (*People v Anderson*, 42 NY2d 35, 38-39 [1977]; *People v Valerius*, 31 NY2d 51, 55 [1972]; *People v Huntley*, 15 NY2d 72, 78 [1965]). Principally at issue here, however, is not the assignment of the burden or the generally applicable standard of proof, but precisely what had to be shown and whether that showing was sufficiently made.

Proof of voluntariness compatible with due process, we have said, will depend upon the particular circumstances—"the totality"—of each case (*Anderson*, 42 NY2d at 38, citing *Clewis v Texas*, 386 US 707, 708 [1967]; *Fikes v Alabama*, 352 US 191, 197 [1957]; *see also Dickerson v United States*, 530 US 428, 434 [2000] ["The due process test takes into consideration the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation"] [citation and internal quotation marks omitted]). In some situations—where, for example, *Miranda* warnings have been timely given—the requisite inference of voluntariness may be relatively easily drawn. But where there has been official illegality potentially impairing the voluntariness of a subsequent admission, the inference will naturally require a more exacting showing.

We have recognized this principle most frequently in cases involving late *Miranda* warnings. In *People v Chapple* (38 NY2d 112 [1975]) we held that the late interposition of those warnings would be "too late" unless there was a demonstration of a "pronounced break" in interrogation adequate to justify a finding that the defendant was no longer under the sway of the prior questioning when the warnings were given (*id.* at 115). We have since reaffirmed the need for this more precise showing under our state constitution (*People v Bethea*, 67 NY2d 364, 368 [1986]; *People v Paulman*, 5 NY3d 122, 129-130 [2005]), notwithstanding federal precedent (i.e., *Oregon v Elstad*, 470 US 298, 310-311 [1985]) suggesting that, in the absence of actual coercion, *Miranda* warnings will ordinarily suffice to demonstrate the voluntariness of statements subsequently made. A less demanding rule, we noted, would have little deterrent effect, since the police could then "question a suspect in custody without warning, provided only they thereafter question him or her again after warnings have been given" (*Bethea*, 67 NY2d at 366).

Where, as here, the predicate for the claim of involuntariness is actual coercion directed at extracting an inculpatory statement, and not simply the failure timely to administer *Miranda* warnings, the People's demonstration of voluntariness must, we think, be particularly responsive to the claim actually made.

Under the *Chapple-Bethea* doctrine a suspect's course of interrogation is assessed using certain fairly objective criteria to characterize it either as unitary or composed of severable, separately Mirandizable segments. But the inquiry as to whether there has been one interrogatory sequence or several does not address the very stubborn problem posed by actual coercion, which involves the physical, cognitive and emotional depletion of the interrogation subject. In situations where the subject has been interrogated over an extremely lengthy period, the existence of objective indicia of separation may well be inadequate to prove that the defendant has been restored to the status of one no longer under the influence of questioning, so as to render plausible the characterization of a subsequent admission as voluntary beyond a reasonable doubt.

## II.

The proof at the hearing held on defendant's suppression motion was that on the evening of March 20, 2007 defendant was escorted from a Syracuse hotel by eight or nine police officers

and transported to the offices of the Syracuse Police Department's Criminal Investigations Division (CID). There, at 11:30 p.m., he was read his *Miranda* rights and placed in what is referred to in the hearing testimony as the "Blue Room"—a 10 by 10, windowless and clockless chamber furnished with three chairs, a table and a one-way mirror. But for accompanied trips to the restroom, defendant remained locked in the Blue Room for the ensuing 49½ hours. He was during this entire time watched and, with only relatively brief intervals, aggressively interrogated by four rotating pairs of detectives, relieving each other pursuant to a schedule devised by the supervising sergeant. Notwithstanding the constant observation of defendant, there is no direct evidence that he slept and, apart from a sandwich he was given on the evening of March 21st, he did not eat. Two of the interrogating detectives testified that by the morning of March 21st, defendant was "defeated" and had "given up," that he constantly stared at the floor, and often wept. As the interrogation progressed, defendant made several statements, which, although not directly inculpatory, suggested his involvement in Ms. Nugent's disappearance and suspected homicide,[2] among them that "[o]nly me, God, and Sharon know what happened to her."

On the evening of March 22nd, as the interrogation neared the end of its second full day, defendant was interviewed by an Assistant District Attorney. Shortly afterward, the supervising sergeant informed defendant that he would be charged with Ms. Nugent's murder. According to the sergeant, defendant became distraught and the sergeant responded by urging defendant to disclose the location of the body. He told defendant, among other things, that the "dumbest thing you've done is not using that body to make a deal!" Defendant then said that he would "give everybody what they want" if he could confer again with the Assistant District Attorney and if he was provided with an attorney of his own.[3] After eliciting defendant's assurance that he

---

**2.** By the time of defendant's March 2007 interrogation, the investigation into Ms. Nugent's disappearance in early February 2007 had progressed to the point where there was strong circumstantial evidence that she had been the victim of a homicide that had occurred on the early morning of February 6th at the residence she shared with defendant. Her body, however, had not been found and there was no direct evidence tying defendant to her demise.

**3.** The administration of *Miranda* warnings notwithstanding, defendant evidently perceived a need to barter for an attorney. It would appear that the

*(n. cont'd)*

was not "wasting [the sergeant's] time" and that he would enable the police to "physically get [Ms. Nugent's] body,"[4] the sergeant contacted the Assistant District Attorney, who, in turn set in motion the process to have counsel appointed.

Upon his arrival at the CID, defendant's assigned attorney spoke with the Assistant District Attorney for about half an hour and was informed about what was a fairly complex case in summary fashion. He stated in his hearing testimony that he was not told how long defendant had been questioned, and, indeed, the Assistant District Attorney testified that he himself was not aware at the time how long the interrogation had been ongoing. An offer was conveyed to assigned counsel that, if defendant disclosed the location of the body, his sentence would be capped at 18 years to life. Counsel then met in the Blue Room with his new client, whom he described as "[e]motional and distraught." After about two hours, counsel emerged and announced that his client should not be questioned further. Defendant was at this time—1:30 a.m. on March 23rd—formally arrested and taken to the Justice Center, where he was booked. The record is silent as to how he spent the balance of the night.

On the morning of the same day, at 9:30, defendant was arraigned in Syracuse City Court. He was then returned to the CID where, after conferring briefly with assigned counsel, he was placed yet again in the Blue Room. He was joined by his attorney, the Assistant District Attorney and the supervising sergeant. At about 11:30 a.m., the sergeant opened the interview by asking, "what happened?," and defendant replied, "I killed her."[5] Defendant then made statements in which he purported to disclose where he had left the body. He said he had deposited the body in a dumpster, which he described, but no dumpster of that description was found at the specified location and Ms. Nugent's body was never recovered.[6]

---

trial court's finding as to the inadequacy of the single set of warnings given at the outset of the interrogation was well founded.

4. It was this assurance that the trial court deemed to have been elicited in violation of defendant's right to counsel.

5. Defendant's assigned attorney evidently anticipated neither the sergeant's open-ended inquiry, nor his client's response. He immediately instructed that defendant was not to be questioned respecting Ms. Nugent's death, only the location of her body.

6. At trial, the People were permitted to introduce evidence that dumpsters at the location pointed out by defendant were regularly emptied and their contents incinerated.

Although defendant's admissions on the morning of March 23rd were made in exchange for sentencing consideration, defendant, in the end, evidently elected to forgo that consideration. He went to trial, was convicted by a jury upon proof including the admissions he made in exchange for the unused sentencing consideration, and was sentenced to a term of 25 years to life.

## III.

Courts have long condemned interrogations designed, as this one was, to break a suspect's will to resist self-incrimination by prolonged and virtually continuous questioning coupled with deprivation of basic human needs, most notably sleep. In *Ashcraft v Tennessee* (322 US 143 [1944]), a 36-hour interrogation conducted like the one here, by rotating teams of police officers, was deemed "so inherently coercive that its very existence is irreconcilable with the possession of mental freedom by a lone suspect against whom its full coercive force is brought to bear" (*id.* at 154). And, in *People v Anderson*, this Court similarly characterized a 19-hour interrogation, performed "in relays," noting that "[t]he potential effect on human beings of the lack of such elemental needs as sleep and sustenance requires no elaboration. Case law repeatedly has emphasized the vital effect that the resultant slowly mounting fatigue may be expected to have on a person's judgment and will" (42 NY2d at 40 [internal quotation marks and citations omitted]).

The present interrogation was well over twice the length of that in *Anderson* and significantly longer than the one in *Ashcraft*. Given the extraordinary privation that was involved—defendant by the session's conclusion having been sleepless for well over 50 hours[7] and having gone without eating for 30 hours—we cannot accept that, once the marathon session was over, defendant commenced rapidly to recover to the point that his basic capacity to exercise independent judgment was restored.

Upon the cessation of questioning on the early morning of March 23rd, defendant was immediately booked and placed in a holding cell to await arraignment. There is no evidence that he slept or ate or even that he was given the opportunity to do so.

---

7. To be added to defendant's sleepless 50 hours in the Blue Room, are the hours he was awake prior to the commencement of the interrogation (*see Anderson*, 42 NY2d at 39 ["(the defendant's) hours in the interrogation room must be added to those which had elapsed since the time he had arisen from his bed on the morning of the day before"]).

Indeed, the proof does not exclude the very real possibility that defendant's passage of an additional eight hours in custody before arraignment exacerbated, rather than ameliorated, the physical and cognitive debilitation resulting from his 49½-hour session in the Blue Room.

We are unwilling to draw the inference, which the People would have us make, that the eight-hour "break" between interrogation and arraignment attenuated the taint of the wrongful interrogation. Defendant's pre- and post-arraignment statements were, despite their temporal separation, in all other ways seamlessly linked. At the end of the marathon session, the utterly spent defendant, in exchange for a lawyer to which he was absolutely entitled, agreed in a statement ultimately suppressed as coerced, to "give everybody what they want," and when he returned to the Blue Room on the morning of the same day and faced the same interrogator across the same table, that is exactly what he did. We do not accept the hypothesis that his intervening stay in a holding pen and arraignment on the charge of murder sufficed to transform his coerced capitulation into a voluntary disclosure. By the time of defendant's post-arraignment statements, his options would have seemed so constricted, by what he had already divulged during the earlier portion of the interrogation,[8] as to render the intervening temporal buffer practically irrelevant. There was, in any event, no proof adduced by the People to justify a contrary conclusion.

Finally, we reject the contention that the entry of counsel guaranteed the voluntariness of defendant's subsequent statements (*see* 96 AD3d at 1377). This contention misconstrues the statement in *Miranda v Arizona* (384 US 436 [1966]) that

> "[t]he presence of counsel, *in all the cases before us today*, would be the adequate protective device necessary to make the process of police interrogation conform to the dictates of the privilege [against self incrimination]. His presence would insure that statements made in the government-established atmosphere are not the product of compulsion" (*id.* at 466 [emphasis supplied]).

Plainly, this language, expressly limited in its reference, was not intended to stand for the proposition that the presence of

---

**8.** Defendant, of course, did not know that his statements during the 49½-hour session would not be admissible.

counsel will invariably be adequate as an assurance of voluntariness. *Miranda* understood the presence of an attorney to be an effective buffer against the coercion present when a defendant "is first subjected to police interrogation while in custody" (*id.* at 477). The decision nowhere suggests that an attorney should be presumed capable of neutralizing the effects of extensive coercive interrogation conducted prior to his or her arrival, in violation of *Miranda*'s own dictates. No decision should be understood to contemplate its own undoing and particularly not by the conduct it forbids.

By the time assigned counsel arrived at the Blue Room, the die was largely cast. His client had, in exchange for his presence, already promised to "give everybody what they want" and had been so depleted by over two days of constant tag-team interrogation as to raise the most serious doubt, unresolved by the hearing evidence, as to his ability usefully to confer with counsel. Defendant distrusted the attorney seemingly procured by his interrogator—indeed, he thought he was not an attorney at all. For his part, the attorney was at a distinct disadvantage. He knew little about the investigation and nothing about the immediately preceding flagrantly illegal interrogation. He had little basis to judge the advisability of the fateful barter to which his client had already agreed and, demonstrably, his presence did little to blunt the momentum of the interrogation conducted in his absence. Ultimately he became an unintended spectator to his client's confession and was called as a prosecution witness at trial.

Even if we were to accept in theory the proposition that an attorney in the untenable position of defendant's assigned counsel could have acted as an equalizer, it is clear that that was not the actual effect of this counsel's entry. If the presence of counsel is to be relied upon as proof that a subsequent confession was not the product of a pre-entry course of coercion, it must be shown that the interposition of the attorney enabled a decision by the client that was not the product of official compulsion. There was no such showing here.

## IV.

We conclude, as a matter of law, that the taint of the wrongful police action was not attenuated. The bar for the prosecution, it is true, has as a practical matter been set very high in this case. But that is what the law requires given the actual coercion inherent in the subject interrogation. Were we in the face of

such circumstances to allow a judgment of conviction premised on statements admitted upon a less exact correspondence between proof and the conclusion of voluntariness, it would raise the possibility that a conviction could be obtained by means demonstrably hazardous to the truth and an anathema to any truly adversarial system of justice.

Accordingly, the order of the Appellate Division should be reversed, defendant's motion to suppress his March 23, 2007 statements granted and a new trial ordered.

Judges GRAFFEO, READ, SMITH, PIGOTT and RIVERA concur; Judge ABDUS-SALAAM taking no part.

Order reversed, defendant's motion to suppress his March 23, 2007 statements granted and a new trial ordered.