[6 NE3d 1124, 983 NYS2d 768]

THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v PAUL AVENI, Respondent.

Argued January 14, 2014; decided February 20, 2014

### APPEARANCES OF COUNSEL

*Janet DiFiore, District Attorney*, White Plains (*Raffaelina Gianfrancesco, Steven A. Bender* and *Richard Longworth Hecht* of counsel), for appellant.

*John F. Ryan, Legal Aid Society of Westchester County*, White Plains (*David B. Weisfuse* of counsel), for respondent.

*Kathleen M. Rice*, Mineola, *Vincent Rivellese*, New York City, and *Hilary Hassler*, for District Attorneys Association of the State of New York, amicus curiae.

### OPINION OF THE COURT

MEMORANDUM.

The appeal should be dismissed upon the ground that the modification by the Appellate Division was not "on the law alone or upon the law and such facts which, but for the determination of law, would not have led to . . . modification" (CPL 450.90 [2] [a]).

On the night of January 12, 2009, police and emergency medical personnel arrived at the residence of defendant's mother in response to her call. They found defendant's girlfriend, Angela Camillo, dead of an apparent heroin overdose. While the police were still at the residence, but after Ms. Camillo's body had been removed, defendant emerged from an attic space and was immediately arrested for violating a temporary order of protection forbidding him from visiting his mother's home. He was taken to the police precinct, read *Miranda* warnings, and

questioned about his possible illicit involvement in Ms. Camillo's death. At first, he claimed that Ms. Camillo arrived at his mother's already intoxicated and that when he subsequently came on the scene in response to a call from his brother reporting Ms. Camillo's condition, he saw that Ms. Camillo was unconscious. He said that he did not stay to help her because of the order of protection, but before leaving told his mother to call 911. He recalled that when he returned to his mother's home later the same night, he found it empty and fell asleep. When he woke and came downstairs he was arrested by an officer who had evidently arrived while he slept.

Defendant refused to sign a statement recounting this narrative, and some four hours later, after being re-read *Miranda* warnings, he was interviewed again. On this occasion, one of the interviewing detectives, although aware that Ms. Camillo was dead, told defendant that

> "she was at the hospital and the doctors are working on her, but it's imperative; did she use any drugs or did she take anything, because whatever medications the doctors give her now could have an adverse effect on her medical condition. You—she's okay now but if you lie to me and don't tell me the truth now and they give her medication, it could be a problem."

Defendant immediately admitted that he had injected Ms. Camillo with heroin. A videotaped statement was then taken during which the interrogators reiterated the substance of their ruse—that Ms. Camillo was alive, but that disclosure from defendant was essential to her safe treatment—and defendant again admitted that he had purchased heroin and injected Ms. Camillo with it.

The trial court denied suppression of defendant's incriminating statements, finding that the deception employed by defendant's interrogators was not so egregious as to cast in question the voluntariness of the resulting confession because there was no accompanying promise or threat (*People v Aveni*, Sup Ct, Westchester County, May 7, 2010, Molea, J., indictment No. 978/2009, citing *People v Pereira*, 26 NY2d 265, 269 [1970], and *People v McQueen*, 18 NY2d 337, 346 [1966]). In reversing the denial of suppression, upon the law and the facts (100 AD3d 228 [2d Dept 2012]), the Appellate Division took a very different view of the deception, finding that it did not simply misrepresent the victim's existential status but implicitly threatened

that defendant could be held responsible for her demise if he did not immediately break his silence as to the nature and extent of Ms. Camillo's drug ingestion. The threat, said the court, was perhaps subtle but nonetheless clear: "[defendant's] silence would lead to Camillo's death, and then he could be charged with her homicide" (100 AD3d at 238). The false prospect of being severely penalized for remaining silent, raised by defendant's interrogators, was, in the court's view, incompatible with a finding that defendant's confession was voluntary beyond a reasonable doubt.

The People now contend that the Appellate Division's finding with respect to the voluntariness of defendant's confession was in error. A voluntariness determination by the Appellate Division on the facts, however, ordinarily implicates a mixture of factual and legal elements resistant to this Court's review.

Here, the People argue that the Appellate Division applied the wrong legal standard when it focused upon the interrogating officer's deception, instead of the entire set of circumstances attending defendant's custodial interrogation and confession. They urge that, had the totality been considered, it would have dictated the conclusion that defendant was not threatened with a homicide prosecution and that his inculpating statements were voluntary. They stress that defendant was not new to the criminal justice system and was given *Miranda* warnings; that he had some higher education; and that he seemed relaxed with his interrogators, was given food, drink and cigarettes, and appeared alert and comprehending during the videotaped portion of the interrogation.* They contend that, at the time defendant confessed to injecting Ms. Camillo with heroin, there could have been no threat of a homicide prosecution because the officers did not yet know what caused Ms. Camillo's death.

It is true that the judicial inquiry as to whether a confession was voluntary in the due process sense is addressed to the totality of the circumstances under which the statement was obtained (*see People v Guilford*, 21 NY3d 205, 208 [2013]). However, the Appellate Division used the correct legal standard in its reversal (100 AD3d at 237). Its determination that the potential to overwhelm defendant's free will was realized was plainly one of fact. Accordingly, the appeal must be dismissed.

* The video recording device, we note, was not turned on until after defendant made his initial inculpating statement.

PIGOTT, J. (dissenting). I dissent because, in my view, although the Appellate Division paid lip service to the totality of circumstances standard (100 AD3d 228, 237 [2d Dept 2012]),* it failed to apply that standard in this case. As a result, the Appellate Division, and now the majority, deviate from a standard that has existed and been relied upon by law enforcement for over 35 years (*see People v Anderson*, 42 NY2d 35, 38 [1977]; *see also People v Guilford*, 21 NY3d 205, 206 [2013]). According to the Appellate Division's understanding of defendant's argument, defendant claims he was deceived when the police officer:

> "explicitly lied to him by telling him that [the victim] was alive and that the physicians treating her needed to know what drugs she had taken or else she could die, and *implicitly* threatened him with a homicide charge by stating, 'if you lie to me and don't tell me the truth now . . . it could be a problem' " (100 AD3d at 237 [emphasis supplied]).

The record belies that "implicit" threat. In actuality, the police officer explained:

> "What I said was, she is at the hospital and the doctors are working on her, but it's imperative; did she use any drugs or did she take anything, because whatever medications the doctors give her now could have an adverse effect on her medical condition. You—she's okay now but if you lie to me and don't tell me the truth now *and they give her medication*, it could be a problem" (emphasis supplied).

The Appellate Division's conclusion that the phrase "it could be a problem" constituted an "implied" threat to charge defendant with homicide is a reach; the officer was plainly referring to the victim's potential reaction that the administered medication would have on any drugs the victim may have ingested. However, the Appellate Division went so far as to conclude that defendant's failure to tell the police what drugs, if any, the victim had ingested " 'could be a problem' *for him*" (100 AD3d at 238 [emphasis supplied]), but the record contains no such threat from the police. In cases like this, where there

---

* It is evident from the opening paragraph of the Appellate Division order that it intended to focus solely on the deceptive techniques employed by the police as opposed to applying the totality of the circumstances test: "This case presents us with an opportunity to decide under what circumstances the police, while interrogating a suspect, exceed permissible deception, such that a suspect's statements to the police must be suppressed because they were unconstitutionally coerced" (100 AD3d at 231).

may be no witnesses other than the victim and the alleged perpetrator, the only proper way to evaluate police conduct is by reviewing the entire case, as opposed to cherry picking a phrase or two from a comprehensive interrogation. Accordingly, I would remand the matter to the Appellate Division for the appropriate application of the totality of the circumstances test.

Chief Judge LIPPMAN and Judges GRAFFEO, READ, SMITH, RIVERA and ABDUS-SALAAM concur; Judge PIGOTT dissents and votes to reverse in an opinion.

Appeal dismissed upon the ground that the modification by the Appellate Division was not "on the law alone or upon the law and such facts which, but for the determination of law, would not have led to . . . modification" (CPL 450.90 [2] [a]), in a memorandum.