People v Disdier (2024 NY Slip Op 51439(U))

[*1]

People v Disdier

2024 NY Slip Op 51439(U)

Decided on October 21, 2024

Supreme Court, Kings County

Perlmutter, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on October 21, 2024
Supreme Court, Kings County

The People of the State of New York

against
Michael Disdier, Defendant.

Ind. No. 76289-23

People: Kings County District Attorney's Office by ADA Jennifer Da Rin
Defendant: Brooklyn Defender Services by Paul Giovanniello

Adam D. Perlmutter, J.

Michael Disdier stands charged with Attempted Assault in the First Degree [P.L. § 110/120.10(1)], inter alia. The Court conducted pretrial hearings on July 24 and August 20, 2024, pursuant to Dunaway v. New York, 441 U.S. 200 (1979), People v. Huntley, 62 NY2d 134 (1984), and People v. Rodriguez, 79 NY2d 445 (1992). For the reasons stated below, the pretrial motions pursuant to Dunaway and Huntley are denied. The People have failed to demonstrate sufficient familiarity between the parties pursuant to Rodriguez. A Wade hearing is ordered prior to trial.
Findings of Fact
The People called two witnesses: Detective Kaitlyn Walsh-Guzman and Detective Frank Ingenito, and the Court credits their testimony in their entirety.
1) Testimony of Detective Kaitlyn Walsh-Guzman
Det. Walsh-Guzman testified that she has been employed by the New York City Police Department ("NYPD") for a total of thirteen years, spending the last seven years assigned to the 75th Precinct Detective Squad investigating incoming complaints. On April 13, 2023, Det. Walsh-Guzman was assigned to investigate a shooting that occurred at 686 Vermont Avenue, located in Kings County, that very same day. The detective testified that she reported to Brookdale Hospital, where she spoke with an eyewitness of the shooting named Nicole Robinson. Ms. Robinson informed Det. Walsh-Guzman that the shooting occurred as the result of a road rage incident and that the victim was her boyfriend, Louis Linder. Ms. Robinson provided a description of the purported shooter: male, in his sixties, with a salt-and-pepper beard. Additionally, Ms. Robinson informed Det. Walsh-Guzman that she recognized the shooter "from the area" and that he was "her friend Kim's aunt's boyfriend." See Tr. July 24, 2024 at 10:8-9. She stated that she had seen this individual "over ten times" throughout the course of her lifetime and "always remembered him being at parties and in the neighborhood." See Tr. July 24, 2024 at 10:21-11:4. Ms. Robinson also provided Det. Walsh-Guzman with an address of the individual at 570 Stanley Avenue.
Det. Walsh-Guzman also spoke with Louis Linder while at Brookdale Hospital. Mr. Linder also informed the detective that he sustained a graze wound from a shot to the chest by a male, [*2]around his own age, and with a salt-and-pepper colored beard. Mr. Linder did not recognize the man who shot him. He did, however, identify the shooter's vehicle as a gray Cadillac.
After speaking with Mr. Linder and Ms. Robinson, Det. Walsh-Guzman visited the location of the incident at 440 New Lots Avenue, where she obtained video surveillance depicting Mr. Linder exit his vehicle, approach the driver of a gray Cadillac, and the glass of the Cadillac shatter. Det. Walsh-Guzman also obtained other surveillance video from immediately before and after the incident. These items corroborated Mr. Linder and Ms. Robinson's account of the shooting occurring as the result of a road rage incident.
On April 13, 2023, Ms. Robinson texted a photograph of Michael Disdier to Det. Walsh-Guzman and identified him as the shooter. Ms. Robinson had obtained the photograph from her friend Kim's Facebook account. A screenshot of this text exchange was admitted into evidence as People's Exhibit 1. Det. Walsh-Guzman then asked Ms. Robinson to come to the 75th Precinct to conduct an identification procedure using a photograph of Mr. Disdier on file with the NYPD. Upon reviewing the photograph at the precinct later that day, Ms. Robinson said that the individual depicted in the photograph was "Mike," also known to her as "Kim's uncle." See Tr. July 24, 2024 at 18:13. The NYPD photograph used as confirmatory identification of Mr. Disdier was admitted into evidence as People's Exhibit 2.
After Ms. Robinson positively identified Mr. Disdier at the 75th Precinct, Det. Walsh-Guzman searched Mr. Disdier's name through NYPD records. Upon doing so, the detective learned that Mr. Disdier had a gray Cadillac was registered to him. She then issued a probable cause ICARD for his arrest and conveyed this information to Det. Ingenito of the 75th Precinct Warrant Squad in order to apprehend Mr. Disdier.
Det. Ingenito arrested Mr. Disdier on April 18, 2023 and transported him to the 75th Precinct. Det. Walsh-Guzman processed the arrest. She and her partner Det. Columbini began to interview Mr. Disdier approximately 3:30 PM. Mr. Disdier was provided water and cigarettes prior to the interview, and Det. Walsh-Guzman stated that she advised him of his Miranda rights by "read[ing] each part of the Miranda warnings to him" and that "he agreed to each part of them." See Tr. July 24, 2024 at 24:2-5. Det. Walsh-Guzman also testified that Mr. Disdier indicated to her that he understood the warnings about his rights and that he agreed to speak with her without any promises or threats made. In the course of the videotaped interview, which was admitted as People's Exhibit 3, Mr. Disdier informed the detectives that there was a road rage incident and that the other individual—presumed to be Mr. Linder—exited his vehicle and began to approach Mr. Disdier's car. Mr. Disdier informed the detectives that he feared for his life and that he thought Mr. Linder had been carrying a knife or an ice pick. Then, Mr. Disdier informed the detectives that he couldn't remember anything after that point, but that if a gun had been used, it was now "in the waters of Canarsie." See Tr. July 24, 2024 at 25:16. Finally, Det. Walsh-Guzman identified Mr. Disdier in the courtroom.
On cross-examination, Det. Walsh-Guzman stated that she had never met Mr. Disdier prior to the interview at the 75th Precinct on April 18, 2023. She also stated that she didn't know from personal observation who had driven Mr. Disdier to the Precinct upon his arrest or whether anything, such as threats or promises, had been conveyed to Mr. Disdier in the course of his transportation. Det. Walsh-Guzman also stated during cross-examination that she and Mr. Disdier had a brief exchange in the holding cells, whereupon she "introduced [her]self as his arresting officer, that we were going to go upstairs and have a conversation if he wanted to. And [she] asked if he knew why he was here, and he said in regards to, he thinks, a road rage incident." See Tr. July 24, 2024 at 33:9-[*3]15. Det. Walsh-Guzman was also cross-examined about the manner in which she conveyed the Miranda warnings to Mr. Disdier, stating in sum and substance: "I have to read you your Miranda rights, it's like the movies." See Tr. July 24, 2024 at 33:12-15. During the course of the interview, Mr. Disdier indicated that he had been taking methadone regularly, and Det. Walsh-Guzman acknowledged during cross examination that he was shaking visibly and did not know if he was experiencing any symptoms of withdrawal at the time. Finally, Det. Walsh-Guzman also testified during cross that Ms. Robinson had not indicated to her the specifics of her interactions with Mr. Disdier or that she had ever spoken to him directly.
On redirect, Det. Walsh-Guzman stated that Mr. Disdier's demeanor "seemed coherent" and that he was able to speak with the officers "willingly and appropriately" in the course of the interview. See Tr. July 24, 2024 at 42:22-43:2.
2) Testimony of Detective Frank Ingenito
On direct examination, Det. Ingenito testified that he was employed by the NYPD for the last thirteen years and had been assigned to the Brooklyn North Warrant Squad for the past eight years. Det. Ingenito is part of the Violent Felony Squad, which covers homicides, non-fatal shootings, and stranger rape cases.
Det. Ingenito was assigned this matter on April 14, 2023, when he spoke to Det. Walsh-Guzman about the issuance of the probable cause ICARD. On April 18, 2023, Det. Ingenito visited 215 Wortman Avenue to apprehend Mr. Disdier. He stated that he knocked on the door, heard a male voice ask who was at the door, and Det. Ingenito identified himself. Several minutes later, a female opened the door, let the detectives in, guided them to the back room of the apartment, and informed them that Mr. Disdier went out the window. Mr. Disdier was discovered on the scaffolding outside of that window, where he was placed under arrest and brought to the 75th Precinct for processing. Det. Ingenito stated that he did not have any conversation with Mr. Disdier upon his transport to the precinct and identified Mr. Disdier in the courtroom.
On cross-examination, Det. Ingenito stated that, other than speaking with Det. Walsh-Guzman, he did not conduct any investigation as to what occurred on the date of the shooting, and that his role in the case was limited strictly to apprehending Mr. Disdier. Det. Ingenito also stated that none of his interactions with Mr. Disdier were recorded on body-worn camera, that there were roughly five to six people on scene to arrest Mr. Disdier, that he had a brief discussion with the female at the door, and that Det. Ingenito placed the handcuffs on Mr. Disdier. Det. Ingenito did not remember who was in the vehicle with Mr. Disdier during his trip to the precinct.
On redirect examination, Det. Ingenito recalled that he was the individual who transported Mr. Disdier to the precinct upon refreshing his recollection with his DD5s. Det. Ingenito also testified that the female at the door at 215 Wortman Avenue was not threatened at any time. Finally, he also stated that, at the time of Mr. Disdier's arrest, body-worn cameras had not been issued to the Brooklyn North Warrant Squad.
Conclusions of Law
In a motion to suppress evidence, "the People have the burden of going forward to show the legality of the police conduct in the first instance." People v. Dunbar, 188 AD3d 1247 (App. Div. 2d Dept. 2020) (quoting People v. Whitehurst, 25 NY2d 389 (1969); see People v. Berrios, 28 NY2d 361 (1971). Once that burden has been met, the burden of persuasion is on the defendant to prove, by a preponderance of credible evidence, that the police conduct was unlawful. People v. Thomas, [*4]291 AD2d 462, 463 (App. Div. 2d Dept. 2002); see People v. Berrios, 28 NY2d 361 (1971); People v. Baldwin, 25 NY2d 66 (1969).
The facts before this Court show that the arrest of Mr. Disdier was proper, and as such, the Dunaway prong of the suppression motion is denied. Generally, absent materially impeaching circumstances, an eye-witness victim of a crime can provide probable cause for the arrest of the assailant even though their reliability has not been established or their information corroborated. See People v. Griffin, 161 AD2d 799 (App. Div. 2d Dept. 1990); People v. Gonzalez, 138 AD2d 622 (App. Div. 2d Dept. 1988); See People v. Crespo, 70 AD2d 661 (App. Div. 2d Dept. 1979); People v. Smith, 124 AD2d 756 (App. Div. 2d Dept. 1986); People v. Marin, 91 AD2d 616, 617 (App. Div. 2d Dept. 1982); People v. Read, 74 AD3d 1245 (App. Div. 2d Dept. 2010). Probable cause may be established where a civilian with personal knowledge communicates directly to the arresting officer circumstances affording a credible ground for believing an offense was committed and identifies the accused as the perpetrator. People v. Walker, 129 AD2d 751 (App. Div. 2d Dept. 1987); (citing Crespo, 70 AD2d at 661); Read, 74 AD3d at 1246; see People v. Jackson, 105 AD3d 866 (App. Div. 2d Dept. 2013). Here, the testimony of Det. Walsh-Guzman established that an eyewitness, Ms. Robinson, had identified Mr. Disdier. Thereafter, Det. Walsh-Guzman conducted an independent investigation and identified Mr. Disdier as the owner of a vehicle identical in make and model to the gray Cadillac that had been seen driven by the shooter on surveillance video. Consequently, the People have established that the detectives possessed the probable cause necessary to arrest Mr. Disdier.
The suppression of all noticed statements to police, pursuant to Huntley, is denied. It is the People's burden to prove the voluntariness of an individual's statements beyond a reasonable doubt for their use in evidence at trial. See People v. Guilfors, 21 NY3d 205, 208 (2013); People v. Anderson, 42 NY2d 35 (1977); People v. Valerius, 31 NY2d 51 (1972); Huntley, 15 NY2d at 72; CPL § 60.45(1). Det. Walsh-Guzman testified, and body-worn camera shows, that Miranda warnings were administered to Mr. Disdier, and that he expressed clear understanding of them. Furthermore, at no point was he threatened or coerced during the interview, and the possibility of threats, coercion, or promises while Mr. Disdier was in transport is purely speculative and contradicted by the record.
Mr. Disdier takes issue with Det. Walsh-Guzman's statements prior to the reading of the Miranda warnings, including that she was required to read him his rights "like in the movies" if he wanted to speak with her. See Tr. Aug. 20, 2024 at 63:21-64:4. Mr. Disdier argues that the sum and substance of Det. Walsh-Guzman's statements prior to reading the Miranda warnings dulled the effectiveness of the warnings. Upon reviewing the interview video and the relevant case law, however, the Court disagrees. No "talismanic incantation [is] required to satisfy [Miranda's] strictures." California v. Prysock, 453 U.S. 355, 359 (1981). What is required is that any preamble to the warnings not "effectively [vitiate] or at least [neutralize] the effect of the subsequently-delivered Miranda warnings." People v. Dunbar, 24 NY3d 304, 316 (2014); see also People v. Rivera, 128 AD3d 1100, 1101 (App. Div. 2d Dept. 2015). In Dunbar, the Court of Appeals determined that a "question-first-and-warn-later protocol" involving a preamble of warnings that included the statements, "If your version of what happened is different from what we've been told, this is your opportunity to tell us your story," and "If there is something you need us to investigate about this case, you have to tell us now so we can look into it" rendered the subsequently issued Miranda warnings ineffective, as they implied "it was in his best interest to get out his side of the story—fast." Id. at 309, 316. In the present case, the Court finds that the statements made by Det. [*5]Walsh-Guzman were not misleading or unclear, such that they would "undercut the meaning of all four Miranda warnings" or deprive Mr. Disdier of "an effective explanation" of his rights. Id. at 316.
Mr. Disdier also argues that the interview was improperly conducted after he expressed that he had been receiving methadone treatment and displayed a shaking hand to the detectives. The record and the interview video belies any contention, however, that Mr. Disdier's will was "so overborne by [his] claimed physical and emotional impairment as to render [his] statements involuntary." People v. Bell, 131 AD2d 859, 861 (App. Div. 2d Dept. 1987). Besides demonstrating a shaky hand, Mr. Disdier did not indicate to the detectives that he was experiencing pain or illness. See People v. Kranz, 180 AD2d 760 (App. Div. 2d Dept. 1992) (finding that Mirandized statements were not involuntary simply because the defendant's injured arm was "heavily bandaged"). In fact, the detectives noted during the interview that they were "able to have an articulate conversation" with Mr. Disdier. See Tr. Aug. 20, 2024 at 72:7-8. Accordingly, the Court finds that Mr. Disdier's statements were made freely and voluntarily after he was appropriately apprised of his Miranda rights.
Finally, the People have failed to demonstrate sufficient familiarity between the parties such that Ms. Robinson's identification of Mr. Disdier was merely confirmatory pursuant to Rodriguez. See People v. Simmons, 247 AD2d 494, 495 (App. Div. 2d Dept. 1998) (finding that a taxi driver was sufficiently familiar with a defendant when the "driver testified that the defendant had been in his taxi on 10 occasions in the eight months prior to the crime, including one occasion two or three days before the crime; that the defendant traveled with the same group of men; that they usually requested that he be their driver; that they always asked to be driven to the same location; and that the defendant always paid the fare."); People v. Garner, 27 AD3d 764, 764 (App. Div. 2d Dept. 2006) (finding a photographic identification merely confirmatory when the hearing record showed that the parties had been friends for almost two years); In re Malcolm G., 38 AD3d 662, 663 (App. Div. 2d Dept. 2007) (finding that the parties were sufficiently familiar with each other when the complainant testified that he observed the appellant "almost every day at school for a period of approximately five months.").
Ms. Robinson identified Mr. Disdier to Det. Walsh-Guzman having recognized him from the neighborhood more than ten times throughout the course of her lifetime at roughly forty years of age. She identified him as "Kim's aunt's boyfriend" or "Kim's uncle" upon speaking with Det. Walsh-Guzman and was able to provide a photograph of Mr. Disdier and his name after consulting Facebook. She was able to provide an address for Mr. Disdier, although that location is different from where Mr. Disdier was apprehended. There exists no record, however, of when the parties last had contact or the nature of the ten-plus contacts between Ms. Robinson and Mr. Disdier. The Court finds that the record does not set forth sufficient familiarity at this juncture between the parties to invoke the confirmatory identification exception. Accordingly, a Wade hearing is ordered prior to trial to ensure that Ms. Robinson's identification was not tainted by unwarranted suggestibility by law enforcement.
This constitutes the decision and order of the Court.
Dated: October 21, 2024
Brooklyn, New York
Hon. Adam D. Perlmutter, A.J.S.C.