■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v DANIEL EDWARDS, Appellant. [712 NYS2d 71] —Cardona, P. J. Appeal from a judgment of the County Court of Schoharie County (Bartlett, III, J.), rendered April 28, 1999, convicting defendant upon his plea of guilty of the crime of murder in the first degree.

On May 12, 1997, Frank Arroyo was shot and killed at his residence in Schoharie County. The investigation focused upon the victim's estranged wife, Donna Arroyo, her boyfriend, Cary McKinley, and defendant, McKinley's stepbrother. On May 18,

1997, six State Police investigators traveled to Florida where they were told, through an informant, that defendant did the shooting and also learned that he was living in Orlando. They proceeded to the Orlando headquarters of the Florida Department of Law Enforcement (hereinafter FDLE) and used that location for their investigation. FDLE special agents were assigned to assist the investigators in their efforts to locate and interview defendant and McKinley.

On the morning of May 20, 1997, Investigators Daniel Davidson and Jeffrey Smith, accompanied by three FDLE agents, located defendant working at a construction site in Punta Gorda, Florida. They did not have arrest warrants for defendant and McKinley as no charges had been filed against them in New York. Defendant agreed to talk with the investigators and accompanied them to a nearby motel where he and McKinley were staying. Both men were driven in separate cars back to FDLE headquarters in Orlando. In separate interviews, each made incriminating oral admissions which were subsequently reduced to written statements and included defendant's confession to the shooting. Felony complaints charging defendant and McKinley with murder in the second degree were filed in the Village Court of Middleburgh, Schoharie County, and arrest warrants were issued at 5:50 P.M. on May 20, 1997. The charges and warrants were faxed to FDLE headquarters at 6:53 P.M. Defendant and McKinley were arrested by FDLE agents as fugitives from justice and returned to New York.

Defendant was indicted for murder in the first degree, murder in the second degree, conspiracy in the second degree and criminal possession of a weapon in the second degree. Thereafter, on January 26, 1998, the District Attorney served upon defendant a notice of his intention to seek the death penalty pursuant to CPL 250.40. On September 28, 1998, following a *Dunaway/Huntley* hearing (*see, Dunaway v New York*, 442 US 200; *People v Huntley*, 15 NY2d 72), County Court denied defendant's motion to suppress oral and written statements and scheduled the trial date for early November 1998.

In October 1998, defendant entered into plea negotiations and, under a plea agreement approved by County Court, pleaded guilty on October 16, 1998 to the first count charging murder in the first degree in full satisfaction of the indictment on the condition that he cooperate with the prosecution. In return, the District Attorney consented to the plea, withdrew the death notice and agreed to a proposed indeterminate sentence of 25 years to life or, in the alternative if defendant failed to cooperate, a maximum of life without parole if such

sentence was deemed appropriate by the court. At the time of the plea, defendant waived his rights to appeal except in reference to the suppression of his statement.

Subsequent to his plea but prior to sentencing, defendant moved to withdraw his guilty plea contending that it was invalid based upon the decision of the Court of Appeals in *Matter of Hynes v Tomei* (92 NY2d 613, *cert denied* 527 US 1015). County Court denied the motion and sentenced defendant to an indeterminate prison sentence of 25 years to life. Defendant contends on this appeal that County Court's suppression determination was erroneous and that it erred in refusing to permit him to withdraw his guilty plea inasmuch as it was taken at a time when the death notice was pending in violation of *Matter of Hynes v Tomei* (*supra*).

Initially, we address the People's argument that defendant's waiver of his right to appeal precludes review of his challenge to the validity of his guilty plea under *Matter of Hynes v Tomei* (*supra*). Although "it is settled that [the waiver of a right to appeal] will be enforced where the facts and circumstances of the case adequately demonstrate that [it] was made knowingly, voluntarily and intelligently and did not result from fraud, duress or coercion" (*People v Harris*, 242 AD2d 782, *lv denied* 91 NY2d 1008; *see, People v Hanna*, 236 AD2d 742, 744, *lv denied* 89 NY2d 1094), here, inasmuch as the plea was entered pursuant to statutory provisions invalidated after defendant's waiver, we find that defendant could not have knowingly and intelligently waived his right to appeal the constitutional infirmity at issue. Moreover, some claims like speedy trial, legality of the sentence, voluntariness of the plea and competency to stand trial cannot be waived because of society's interest in the integrity of the criminal justice system (*see, People v Seaberg*, 74 NY2d 1, 9). In our view, defendant's challenge to the validity of his plea entered pursuant to statutory provisions struck from the State's death penalty law by the Court of Appeals prior to his sentencing falls within the category of claims that cannot be waived (*see, id.*, at 9).

We turn next to defendant's contention that the Court of Appeals' decision in *Matter of Hynes v Tomei* (92 NY2d 613, *supra*) rendered his guilty plea invalid. In *Matter of Hynes v Tomei* (*supra*, at 626), the Court stated that: "Capital defendants under the New York statute who are awaiting trial and are offered a plea are still faced with the choice *Jackson* [*United States v Jackson*, 390 US 570] declared unconstitutional: exercise Fifth and Sixth Amendment rights and risk death, or abandon those rights and avoid the possibility of death." Rather

than invalidating the entire 1995 death penalty statute, the court struck the offending guilty plea provisions set forth in CPL 220.10 (5) (e) and 220.30 (3) (b) (vii) and held that the resulting statute prohibited a guilty plea to murder in the first degree while a notice of intent to seek the death penalty is pending. The Court further noted: "Thus, while a defendant may not plead guilty to first degree murder while a notice of intent to seek the death penalty is pending, plea bargaining to lesser offenses even when a notice of intent is pending, or to first degree murder in the absence of a notice of intent, remains unaffected" (*Matter of Hynes v Tomei, supra,* at 630).

In the instant case, the prosecutor was permitted to withhold her consent to the plea and her withdrawal of the notice of intent to seek the death penalty until after defendant proffered his plea to County Court and made a complete allocution. County Court determined that the plea procedure did not violate the holding in *Matter of Hynes v Tomei* (*supra*) because defendant had not "entered his plea" until after the death notice was withdrawn. This same procedure was followed in *People v Smelefsky* (182 Misc 2d 11). There, the court reasoned that since a guilty plea cannot be *entered* without court permission (*see,* CPL 220.60), it is really not cognizable until a court accepts it (*see, People v Smelefsky, supra,* at 18-19; *see also, People v Hood,* 62 NY2d 863, 865 [a plea bargain does not gain judicial recognition until it is entered on the record]). Thus, in *People v Smelefsky* (*supra,* at 19) the trial court held that "a guilty plea to murder in the first degree is valid under *Matter of Hynes v Tomei* [*supra*] so long as no notice of intent to seek the death penalty is pending when the court accepts and enters the plea".

We find this scheme flawed because it overlooks the essence of the *Hynes-Jackson* infirmity. That constitutional infirmity arises not from the *entry* of a guilty plea to murder in the first degree while a death notice is pending, but from the requirement placed upon a defendant *to choose* between pleading guilty to murder in the first degree or opting for trial while a death notice is pending. If a prosecutor who has served a death notice is permitted to delay its withdrawal until after a defendant's plea allocution, then the choice to plead guilty has been made under compulsion of the death notice and a defendant's 5th and 6th Amendment rights have been impermissibly burdened. In our view, the mere proffer of a plea bargain to murder in the first degree while a death notice is pending presents a capital defendant with the same unconstitutional choice faced by the defendants in *Matter of Hynes v*

*Tomei* (*supra*) and *Matter of Relin v Connell* (92 NY2d 613), namely, "exercise Fifth and Sixth Amendment rights and risk death, or abandon those rights and avoid the possibility of death" (*Matter of Hynes v Tomei, supra,* at 626). Thus, we find that it is constitutionally impermissible for prosecutors to negotiate guilty pleas to murder in the first degree while a notice of intent to seek the death penalty is pending. Accordingly, defendant's guilty plea to murder in the first degree must be vacated as violative of the holding in *Matter of Hynes v Tomei* (*supra*) and *Matter of Relin v Connell* (*supra*).

Next, defendant contends that his written statement was (1) the product of unlawful custodial detention, (2) involuntarily given, and (3) obtained after his New York right to counsel attached. Based upon our review of the minutes of the suppression hearing, we find none of the arguments persuasive. At the outset, we note that the investigators conceded that they lacked probable cause to arrest or detain defendant against his will prior to his admission of complicity in the shooting. The determination of custody requires application of an objective standard of "what a reasonable [person], innocent of any crime, would have thought had he been in the defendant's position" (*People v Yukl*, 25 NY2d 585, 589, *cert denied* 400 US 851; *see, People v Centano*, 76 NY2d 837, 838; *People v Cleveland*, 257 AD2d 689, 691, *lv denied* 93 NY2d 871).

Evidence in the record reveals that defendant was initially confronted at his job site by five plainclothes police officers. Davidson identified himself to defendant, shook hands with him and told him they were investigating a shooting incident in upstate New York and he might have information that would help their investigation. Defendant stated that he was "expecting [them] to show up" and agreed to accompany them. For their safety, Smith patted defendant down for weapons and defendant rode to the motel in the backseat of Davidson's rental car without any restraints. At the motel, defendant exited the vehicle on his own and smoked a cigarette while the investigators talked to McKinley. Thereafter, defendant was told they were going to FDLE headquarters in Orlando and agreed to do so. He was not questioned regarding the matter during the 2½-hour trip and napped part of the time. When they arrived at FDLE headquarters at about 2:00 P.M., defendant got out of the car and smoked another cigarette. He entered the building escorted by the officers and, after arriving on the second floor, was specifically informed by FDLE Special Agent Steven Desposito that while he was not under arrest, the investigators wanted to speak to him about what occurred in New York.

Defendant stated that he wished to discuss the matter and resolve it so that he could be on his way. Davidson led defendant into a 12-foot by 12-foot working office of one of the FDLE agents. Prior to beginning the interview, defendant was given his *Miranda* rights and waived them, agreeing to speak. He then began to give an exculpatory statement; however, when Davidson told him that a co-conspirator had identified him as the shooter, defendant put his head down. When Davidson asked him if he shot the victim, defendant replied yes. This occurred approximately 15 or 20 minutes into the interview, and during the next hour they discussed defendant's actions from the time he left Florida to the time he returned.

Thereafter, Davidson began taking a written statement at 3:30 P.M. and it was completed and signed at 5:50 P.M. During the interview, defendant never asked to speak to family or to an attorney. He never asked to leave or to end the questioning. Despite other evidence in the record suggestive of custody, we cannot say that County Court's factual determination that defendant was not in custody prior to making the statement in question "is erroneous as a matter of law or unsupported by the record" (*People v Smith*, 214 AD2d 845, 847, *lv denied* 86 NY2d 741; *see*, *People v Centano*, 76 NY2d 837, *supra*).

Defendant further contends that his statements were the product of psychological coercion. The fact that Davidson discussed the death penalty did not, in the absence of an assurance of lenient treatment, create a substantial risk that defendant would falsely incriminate himself (*see*, *People v Williamson*, 245 AD2d 966, 968, *lv denied* 91 NY2d 946). We note that Davidson expressly denied telling defendant that he could avoid the death penalty by cooperating with the authorities. Moreover, we find insufficient evidence of any promises or threats made to defendant or an atmosphere of intimidation which overcame defendant's will. Viewing the totality of the circumstances, we conclude that the People proved the voluntariness of defendant's statements beyond a reasonable doubt (*see*, *People v Anderson*, 42 NY2d 35, 38).

Finally, defendant argues that his written statement should be suppressed because it was signed after his right to counsel attached. The evidence shows that upon the filing of the felony complaint, the Village Justice of Middleburgh issued an arrest warrant for defendant at 5:50 P.M. on May 20, 1997. There is no question that at that time defendant's indelible right to counsel attached and the investigators were prohibited from questioning him in the absence of an attorney (*see*, *People v Harris*, 77 NY2d 434, 440; *People v Samuels*, 49 NY2d 218,

221-222). There is also no question that Davidson initially wrote 6:20 P.M. in the "time ended" heading on defendant's statement and then changed the time to 5:50 P.M. He did that, he said, because he actually finished taking defendant's statement some 30 minutes earlier, but incorrectly included an additional half hour spent filling out a background questionnaire with defendant. Davidson explained the change to defendant, who initialed it. We note that Smith similarly changed the end time on McKinley's statement from 6:10 P.M. to 5:10 P.M. and that Senior Investigator Michael Guiry changed his notes to reflect the completion of defendant's statement, including signature, from 5:30 P.M. to 5:50 P.M. with the notation "approx" preceding it, because that was the time Davidson said he had finished.

While the investigators' testimony may raise doubt with regard to the accuracy of their revised times, we cannot say that County Court's decision, as the trier of fact, to credit their contentions from among conflicting inferences was erroneous as a matter of law or unsupported by the record (*see, People v Smith*, 214 AD2d 845, 847, *supra*; *People v Smith*, 193 AD2d 1054, *lv denied* 82 NY2d 853), particularly in light of Investigator Dennis Moessner's testimony that he did not send Investigator Peter Scotti to file the complaints and obtain the warrants at the Village of Middleburgh Court until after Moessner received a call from Guiry around 5:30 P.M., advising that the written statements had been secured. Accordingly, we decline to disturb County Court's suppression determination based upon the claimed violation of his right to counsel.

Mercure, Spain, Carpinello and Rose, JJ., concur. Ordered that the judgment is reversed, on the law, defendant's plea and sentence vacated, and the indictment is restored to the pre-plea stage with the notice of intent to seek the death penalty reinstated. [*See,* 180 Misc 2d 564.]