Scheuer v State of New York (2021 NY Slip Op 05906)





Scheuer v State of New York


2021 NY Slip Op 05906


Decided on October 28, 2021


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered:October 28, 2021

531611 531619
[*1]Jennifer Scheuer et al., as Coadministrators of the Estate of Janet L. Croote, Deceased, and Substitute Coadministrators of the Estate of James T. Croote, Deceased, Respondents,
v
State of New York, Appellant. (Claim No. 1.)
Jeremy J. Killenberger, Respondent,
v
State of New York, Appellant. (Claim No. 2.)

Calendar Date:September 17, 2021

Before:Garry, P.J., Egan Jr., Lynch, Clark and Pritzker, JJ.

Letitia James, Attorney General, Albany (Owen Demuth of counsel), for appellant.
Law Offices of John R. Seebold, PLLC, Schenectady (John R. Seebold of counsel), for respondents.



Pritzker, J.
Appeals from two judgments of the Court of Claims (Ferreira, J.), entered May 27, 2020, upon a decision of the court in favor of claimants.
On March 2, 2005, at approximately 10:00 a.m., James T. Croote (hereinafter decedent) and claimant Jeremy J. Killenberger were passengers in a vehicle being driven by a third party, Kevin Miller. Miller was driving west on State Route 7 in the Town of Princetown, Schenectady County when he lost control of his vehicle as a result of snow and ice conditions, causing the vehicle to cross over the center lane and into the path of a snowplow owned by the Schenectady County Department of Public Works and operated by Edward Kuras. The passenger side of Miller's vehicle collided with the front of the snowplow; decedent died upon impact, and Killenberger was injured.
In February 2007, Janet L. Croote (hereinafter Croote), individually and as administrator of decedent's estate, and Killenberger filed these separate claims sounding in negligence and seeking damages arising from the accident. The two claims were joined for the purpose of trial, and, after a bifurcated nonjury trial on the issue of liability, the Court of Claims issued a decision in September 2016 finding that Croote and Killenberger had proven, by a preponderance of the evidence, that defendant had actual notice of a recurring dangerous condition and that its failure to address that roadway condition was a proximate cause of the accident, as was Miller's manner of driving and speed of travel. Accordingly, the court apportioned liability as 75% against defendant and 25% against Miller and entered an interlocutory judgment as to Croote and Killenberger. Two separate nonjury trials on damages were then held and, after motion practice, the Court of Claims, by judgments entered May 27, 2020, awarded Killenberger $2,193,622.63 and Croote $150,000.[FN1] Defendant appeals from both judgments.
Defendant contends that Croote and Killenberger failed to prove negligence by a preponderance of the evidence, specifically asserting that the storm in progress doctrine shielded it from liability and, moreover, it took reasonable measures to remove the dangerous condition. "Defendant owes the public a nondelegable duty to maintain its roadways in a reasonably safe condition" (Schleede v State of New York, 170 AD3d 1400, 1401 [2019] [internal quotation marks, brackets and citation omitted]; see Harjes v State of New York, 71 AD3d 1278, 1279 [2010]), and "it is a matter of established law that the pertinent inquiry is whether defendant exercised reasonable diligence in maintaining the roadway under the prevailing circumstances" (Frechette v State of New York, 129 AD3d 1409, 1410 [2015] [internal quotation marks, brackets and citations omitted]). However, "[u]nder the storm in progress doctrine, a landowner's duty to take reasonable measures to remedy a dangerous condition caused by a storm is suspended while the storm is ongoing until a reasonable time after the storm [*2]has ended" (Baumann v Dawn Liqs., Inc., 148 AD3d 535, 537 [2017]; see Solazzo v New York City Tr. Auth., 6 NY3d 734, 735 [2005]). Nevertheless, "if the storm has passed and precipitation has tailed off to such an extent that there is no longer any appreciable accumulation, then the rationale for continued delay abates, and commonsense would dictate that the rule not be applied" (Patricola v General Motors Corp., 170 AD3d 1506, 1506-1507 [2019]; see Mazzella v City of New York, 72 AD3d 755, 756 [2010]). Further, a defendant may be held liable in negligence "where it did not correct or warn of a recurrent dangerous condition of which it had notice" (Frechette v State of New York, 129 AD3d at 1411 [internal quotation marks, brackets and citations omitted]; see Harjes v State of New York, 71 AD3d at 1279).
During the liability portion of the bifurcated trial, an accident reconstruction expert with the State Police testified that he arrived at the scene approximately 40 minutes after the accident occurred. The reconstruction expert described that it was not snowing at the time he arrived at the scene and opined that there was no active precipitation at the time of the accident. However, "there was snow blowing across the road, and in the absence of passing traffic and plowing, it had actually begun to stick to the road and accumulate." The reconstruction expert ultimately concluded that the "primary cause" of the accident was Miller's "failure to maintain the designated lane of travel, due to speed not reasonable and prudent for the existing conditions." A state trooper also testified regarding the scene of the accident. He recalled that he was the first trooper to arrive at the scene and that the weather had been "extremely cold" that morning but that it was not snowing. He also stated that he observed that the roadway "did have snow on it, but that was due to the wind" and that this area "was a known area to have snow on the road, covered from the wind." The trooper confirmed that Miller was issued a ticket for unsafe speed.
Kuras testified that, on the day preceding the accident, he had been plowing after a snowstorm and averred that precipitation had been light. Kuras went on to testify that he was called in at 3:30 a.m. on the morning of the accident. He averred that, after a snow event, "[t]he snowdrift would come across both lanes eastbound and westbound" and that this occurs "every time when it snows." Kuras recalled that, on the day of the accident, there was very little plowing to be done and that the snowplow was needed most "in that drift area." Kuras testified that "[snow] was building up faster than [he] could keep up with," and that, between 4:00 a.m. and the time of the accident, he had "been on that road about three times." Kuras stated that it was not snowing at the time of the accident and that he did not believe that it had snowed in the hours leading up to the accident because "it's considered a clean up day after [*3]a storm." Kuras recalled observing Miller's vehicle "hit the patch of ice and snow" before fishtailing and then colliding with his snowplow.
Multiple witnesses from the State Police, including troopers and investigators, testified to their knowledge of the blowing and drifting snow conditions and other car accidents that occurred in the same area due to those conditions. Vincent Budinas, who was a resident engineer with defendant's Department of Transportation at the time of the accident, testified that the Department of Transportation's "Highway Maintenance Guidelines" are provided to the Schenectady County Department of Public Works and are instructive as to snow and ice control. Budinas confirmed that the scene of the accident was "an area of special consideration," meaning that it is "[a]n area that would require certain consideration during and after a snowstorm" because of recurring blowing snow. Budinas explained methods of passive snow control, including snow fences, and was unable to answer why no snow fence was placed in that area. Jerome Thomas, a civil engineer, testified that he reviewed weather data and reports in the days leading up to and the day of the accident, and he averred that there was a "storm in progress" the day before the accident but that, on the day of the accident, it was a sunny and windy day with blowing snow, and it was his opinion that there was no "storm in progress." Thomas averred that his review of depositions of Schenectady County employees indicated that "every year, they had blowing snow and drifting snow across the roadway." Thomas ultimately opined that the County and defendant "did not make full use of the Highway Maintenance Guidelines as to snow and ice, and that, "[w]ithout question[,] . . . they should have used [a] snow fence," "so that the snow could be stopped from drifting onto the highway."
In opposition, defendant called William Logan, another civil engineer, who averred that, where there is a blow-over area (i.e., where wind-blown snow accumulates), "spot treatment" is an adequate remedy and that, at the scene of the accident, the roadway was passable and reasonably safe. According to Logan, not all blowing snow constitutes a snow drift and that the scene of the accident is an example of where there was blowing snow/a snow-covered road but no persistent snow drifting. Logan asserted that the scene of the accident had not met the threshold number of car accidents in order to qualify as a "priority investigation location." Ultimately, Logan opined that the scene of the accident was not a hazardous location and that spot treatment was appropriate to address the recurring blowing snow in that area.
"In reviewing a nonjury verdict on appeal, [this Court has] broad authority to independently review the probative weight of the evidence, while according appropriate deference to the [trial] court's credibility determinations and factual findings" (Driscoll v State of New York, 160 AD3d [*4]1240, 1242-1243 [2018] [internal quotation marks and citations omitted]; accord Howell v State of New York, 169 AD3d 1208, 1209 [2019], lv denied 33 NY3d 907 [2019]). In doing so, we find no basis to disturb the determinations and findings of the Court of Claims. To that end, contrary to defendant's contention, the evidence at trial established that there was not a storm in progress at the time of the accident. Although there was abundant testimony indicating the snow on the road at the scene of the accident was wind-blown from nearby fields, we decline the invitation to broaden the storm in progress theory to include this situation. As such, the attendant doctrine excepting the ordinary duty of care owed does not shield defendant from liability (see Mosley v State of New York, 150 AD3d 1659, 1661 [2017]). In this regard, the Court of Claims correctly determined that Killenberger and Croote had proven that defendant had actual notice of a recurrent blowing snow condition, as evinced by repeated and consistent testimony from multiple witnesses that the scene of the accident was known for having snow drifts caused by the open fields on either side of Route 7. Testimony and accident reports from that area indicated that the snow drifting condition caused other car accidents. Accordingly, the inquiry turns to "whether defendant exercised reasonable diligence in maintaining the roadway under the prevailing circumstances" (Frechette v State of New York, 129 AD3d at 1410 [internal quotation marks, brackets and citations omitted; emphasis added]). To that end, the evidence at trial established that defendant's method of addressing the blowing snow condition was with snowplow spot treatment and that Kuras had made three passes through the area in the hours leading up to the accident. Killenberger and Croote established that not only was defendant's spot treatment an inadequate remedy, as evinced by Kuras's testimony that he could not keep up with the accumulation of blowing snow, but also that the use of such spot treatment was unreasonable in light of defendant's actual notice that this area experienced blowing snow and snow drifts every year (see Mosley v State of New York, 150 AD3d at 1661; Frechette v State of New York, 129 AD3d at 1412-1413; compare Harjes v State of New York, 71 AD3d at 1280).
Defendant, alternatively, asserts that its comparative fault should be reduced to 25% because Miller's failure to drive reasonably under the circumstances was the primary proximate cause of the accident. We disagree. Defendant failed to prove that Miller's manner of driving was the primary proximate cause of the accident; defendant was unable to establish the speed at which Miller was traveling, and the only evidence of this conduct was the testimony of Killenberger that he believed that Miller was driving too fast and that Miller was issued a ticket for failing to adequately reduce his speed prior to approaching a curve in the roadway. Simply stated[*5], this evidence does not establish that Miller's speed, on balance, established that he was 75% at fault and defendant only 25% at fault (see Carthen v Sherman, 169 AD3d 416, 418 [2019]; Alger v Coleman, 150 AD2d 933, 934 [1989]). Moreover, the fact that the Court of Claims apportioned Miller with 25% fault demonstrates that it considered Miller's unsafe speed in its apportionment analysis (see Alger v Coleman, 150 AD2d at 934; see generally Rakich v Lawes, 186 AD2d 932, 934 [1992]). Based upon the foregoing, and according due deference to the court's unchallenged credibility determinations, the liability determination and apportionment of liability is supported by the record (see Mosley v State of New York, 150 AD3d at 1661; Smith v State of New York, 121 AD3d 1358, 1360 [2014]).
Garry, P.J., Egan Jr., Lynch and Clark, JJ., concur.
ORDERED that the judgments are affirmed, with one bill of costs.



Footnotes

Footnote 1: Croote died in July 2018. As a result, claimant Jennifer Scheur and claimant Timothy A. Benson, coadministrators of Croote's estate and substitute coadministrator's of decedent's estate, were substituted as claimants in claim No. 1.