Dukes v State of New York (2024 NY Slip Op 06397)

Dukes v State of New York

2024 NY Slip Op 06397

Decided on December 19, 2024

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:December 19, 2024

CV-23-0738
[*1]Carl Dukes, Appellant,
v
State of New York, Respondent.

Calendar Date:November 19, 2024

Before:Aarons, J.P., Reynolds Fitzgerald, Ceresia, McShan and Mackey, JJ.

Kelner & Kelner, Esqs., New York City (Joshua D. Kelner of counsel), for appellant.
Letitia James, Attorney General, Albany (Frank Brady of counsel), for respondent.

Ceresia, J.
Appeal from a judgment of the Court of Claims (Catherine E. Leahy-Scott, J.), entered April 7, 2023, upon a decision of the court in favor of defendant.
This case comes before us for a second time (167 AD3d 1360 [3d Dept 2018]). Briefly, in October 1996, claimant, Lavell Jones and three other individuals participated in a robbery at the Albany apartment of Erik Mitchell, a college student and marihuana dealer. Approximately four months later, Mitchell was found lying unresponsive in the entryway of his apartment, suffering from a gunshot wound to the head that proved fatal. Claimant and Jones became targets of the investigation into Mitchell's murder and, after being interrogated by the police, each made a written confession in which he admitted to being present at the shooting and implicated the other as the shooter. Claimant and Jones were then indicted in connection with both the robbery and the murder. In January 1999, following separate jury trials, they were convicted of crimes related to the robbery and the murder and sentenced to lengthy prison terms.
In September 2014, Jeffrey Conrad was in police custody in Ohio, having confessed to stabbing his girlfriend to death, when he also admitted to shooting Mitchell. Albany detectives then traveled to Ohio to interview Conrad, who provided additional details about the Mitchell shooting. The Albany County District Attorney's office thereafter reopened its investigation into Mitchell's murder and concluded that Conrad's confession created reasonable doubt as to claimant's and Jones' guilt.[FN1] Thus, when claimant and Jones moved to vacate their convictions based upon newly discovered evidence — namely, Conrad's confession — the People joined in those motions. The motions were granted, after which the murder charges were dismissed on motion by the People in the interest of justice. Claimant and Jones each pleaded guilty to a robbery charge and received a sentence amounting to time served.
Claimant and Jones subsequently filed claims for unjust conviction and imprisonment pursuant to Court of Claims Act § 8-b. Following discovery and motion practice, a joint trial ensued. Ultimately, the Court of Claims found that defendant was liable to Jones but not liable to claimant and entered judgment accordingly. Claimant appeals.
As a preliminary matter, the Court of Claims did not err in excluding certain evidence. During the trial, claimant sought to introduce testimony that Kenneth Wilcox, one of the two detectives who interrogated him, had subsequently acted as an unindicted coconspirator in a fraudulent real estate scheme. "The general rule is that a party may not introduce extrinsic evidence on a collateral matter solely to impeach credibility" (People v Alvino, 71 NY2d 233, 247 [1987] [citations omitted]; accord People v Hahn, 159 AD3d 1062, 1066 [3d Dept 2018], lv denied 31 NY3d 1117 [2018]). Inasmuch as the proffered testimony had no bearing on the issues of the case and served only to impeach Wilcox's [*2]credibility, it was properly excluded (see People v Kerley, 154 AD3d 1074, 1075 [3d Dept 2017], lv denied 30 NY3d 1106 [2018]). To the extent that claimant argues that the evidence was probative of Wilcox's reputation for dishonesty, it was not admissible for this purpose either, as "[i]t is well settled that impeachment of a witness by evidence of his reputation in the community is limited to his reputation for truth and veracity, and may not extend to . . . specific acts of dishonesty, immorality or crime" (Stanton v Velis, 172 AD2d 415, 415 [1st Dept 1991]; accord People v Schafer, 81 AD3d 1361, 1363 [4th Dept 2011], lv denied 17 NY3d 861 [2011]; see People v Concepcion, 175 AD2d 324, 327 [3d Dept 1991], lv denied 78 NY2d 1010 [1991]).
Turning to the merits, in order to sustain a claim for unjust conviction and imprisonment under Court of Claims Act § 8-b, a claimant bears the burden of proving, by clear and convincing evidence and as relevant here, that he or she is actually innocent of the charged crime and that he or she did not bring about the conviction by his or her own conduct (see Court of Claims Act § 8-b [5] [c], [d]; Salce v State of New York, 184 AD3d 1037, 1038 [3d Dept 2020]). "In reviewing a judgment rendered after a nonjury trial, this Court may independently review the evidence and, while according appropriate deference to the trial court's credibility assessments and factual findings, grant the judgment warranted by the record" (Serrano v State of New York, 179 AD3d 1357, 1358 [3d Dept 2020] [internal quotation marks and citations omitted], lv denied 35 NY3d 914 [2020]; see Scheuer v State of New York, 198 AD3d 1225, 1229 [3d Dept 2021]).
When considering the question of whether a claimant has brought about the conviction by his or her own conduct, such as by confessing to the crime, we note that "a coerced false confession does not bar recovery under [Court of Claims Act §] 8-b because it is not the claimant's 'own conduct' within the meaning of the statute" (Warney v State of New York, 16 NY3d 428, 436 [2011]; accord Gristwood v State of New York, 119 AD3d 1414, 1416 [4th Dept 2014]). A confession will be deemed to have been psychologically coerced by law enforcement when "the form of interrogation was so fundamentally unfair as to deny [a defendant] due process," such as when an officer makes "a promise or threat that could induce a false confession" (People v Johnson, 225 AD3d 927, 932 [3d Dept 2024] [internal quotation marks, ellipsis and citations omitted], lv denied 42 NY3d 927 [2024]; see CPL 60.45 [2] [b] [i]).
Here, the Court of Claims determined that claimant's confession was not the product of coercion. In arriving at this conclusion, the court considered the accounts of the only three people who were in the room when the confession was obtained: claimant, Wilcox and Detective Ronald Matos. Initially, we observe that, while claimant's account differed starkly from that of Wilcox and Matos in key respects, this was [*3]not "a classic he-said [ ]he-said credibility determination for [the Court of Claims] to resolve" (Salce v State, 184 AD3d at 1040 [internal quotation marks and citations omitted]), because the court did not have the benefit of considering live testimony from all three witnesses. Rather, claimant was the only one of the three to testify. Wilcox was deceased at the time of trial and defendant did not call Matos as a witness, instead submitting transcripts of testimony by Wilcox and Matos given at previous proceedings. Thus, while recognizing that the court was able to personally observe claimant's testimony, we note that we are in the same position as the court to evaluate the appropriate weight to be given to the pretrial testimony of Wilcox and Matos.
Claimant, who was 19 years old when he was interrogated, testified that although he proclaimed his innocence dozens of times, the detectives pressured him to confess his involvement in the murder and Wilcox told him that if he did not cooperate with the investigation, he would receive the death penalty by lethal injection — specifically, that "[t]hey were going to inject a hot ball of wax into my f-ing arm." Wilcox also called claimant names such as "chump" and "punk." According to claimant, he eventually signed a statement that had been narrated by Wilcox and written by Matos, testifying that he did so because "I didn't want to die . . . . I was scared for my life . . . . And the most important thing to me at that point in time was getting the hot ball of wax in my arm. I just — I didn't want to die. I didn't want to die. Whatever it took to do that and then my going home to see my family and kid was secondary to that. I just didn't want to die." Wilcox, for his part, denied threatening claimant with the death penalty and stated that, with the exception of one outburst, claimant was otherwise mostly calm and cooperative. As for Matos, the Court of Claims acknowledged that it was "[a]pparent . . . that he lacked independent recollection" of taking claimant's confession. When asked whether Wilcox had mentioned the death penalty, Matos stated that he could not "remember either way," although he also testified that, as a general matter, he would not discuss sentencing possibilities with suspects because he lacked authority to engage in those discussions.
We find that claimant's account of being coerced is compelling. In that regard, in our view, the unique descriptor of lethal injection as a "hot ball of wax" is a characterization that seems unlikely to be fabricated. Furthermore, Jones, like claimant, testified during the joint trial that he was called names and threatened with the death penalty by several detectives, including Matos, if he did not sign a confession. The Court of Claims determined that the name-calling and death penalty threats constituted coercive conduct in Jones' case, rejecting Matos' assertion that sentencing consequences were not discussed during interrogations, yet the court [*4]reached the opposite conclusion in claimant's case. In so concluding, the court acknowledged that Jones' account was corroborated by the testimony of his girlfriend, who stated that the police induced her to sign a statement inculpating Jones and told her that Jones would face the death penalty if she did not. Significantly, we cannot ignore the fact that there was similar corroboration in claimant's case. That is, claimant's sister also testified and provided a very similar account of what the police did to try to convince her to implicate her brother, namely that they wanted to help her help her brother "so that he wouldn't get the death penalty." Despite that, the court made no mention of claimant's sister's testimony. Under these circumstances, we conclude that claimant proved by clear and convincing evidence that he was coerced into providing a confession by virtue of the fact that he was threatened with the possibility of receiving the death penalty if he did not cooperate with the investigation (see Bussey v State, 184 So 3d 1138, 1145-1146 [Fla 2d Dist Ct of Appeal 2015]; People v Sanders, 112 AD3d 748, 756 [2d Dept 2013] [Hall, J., dissenting], affd 25 NY3d 337 [2015]; cf. People v Edwards, 274 AD2d 754, 759 [3d Dept 2000], rev'd on other grounds 96 NY2d 445 [2001]), such that he did not contribute to his own murder conviction (see Gristwood v State, 119 AD3d at 1416; see also People v Aveni, 100 AD3d 228, 239 [2d Dept 2012], appeal dismissed 22 NY3d 1114 [2014]).
Having held that claimant's confession was the product of undue coercion, we will not consider it when analyzing whether claimant has proved his innocence under Court of Claims Act § 8-b. Therefore, we are left with one confession to the Mitchell murder — Conrad's — and we must determine whether Conrad's confession demonstrates claimant's actual innocence by clear and convincing evidence. In undertaking such a task, we have the ability to independently evaluate Conrad's veracity, as his statements were videotaped and entered into evidence, and we have reviewed them.
Conrad provided a detailed and highly accurate account of shooting Mitchell, over 16 years after the fact, to two Ohio detectives who knew nothing about the crime. Among other things, Conrad correctly gave the detectives the month and year of the killing, Mitchell's name and description, the street where he lived, the location of his vehicle, the layout of his apartment entryway, the lack of forced entry, the manner in which Mitchell was shot, the caliber of bullet used, the location where Mitchell was found and the fact that other individuals were imprisoned for the murder. Conrad had no discernible incentive to make this confession, and he was known to be an extremely dangerous person, according to witness testimony. While the Court of Claims found that aspects of Conrad's confession did not comport with the evidence collected at the scene, these concerned, at most, minor details that were readily accounted for by [*5]the passage of time. We disagree with the court's assessment concerning Conrad's confession and find that it did suffice for claimant to meet his burden of proving that Conrad killed Mitchell and, therefore, claimant was innocent of the murder (see Gristwood v State, 119 AD3d at 1416).
In sum, based upon the foregoing, claimant sufficiently established that he is actually innocent of the murder of Erik Mitchell and that he did not contribute to his own conviction (see Court of Claims Act § 8-b [5]). Accordingly, the judgment must be reversed.
Aarons, J.P., Reynolds Fitzgerald, McShan and Mackey, JJ., concur.
ORDERED that the judgment is reversed, on the law and the facts, with costs, verdict directed in favor of claimant on the issue of liability, and matter remitted to the Court of Claims for a determination of claimant's damages.

Footnotes

Footnote 1: Conrad was never arrested for Mitchell's murder, given the District Attorney's conclusion that claimant's and Jones' confessions likewise could have created reasonable doubt as to Conrad's guilt.