Roque v State of New York (2021 NY Slip Op 06016)





Roque v State of New York


2021 NY Slip Op 06016


Decided on November 4, 2021


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered:November 4, 2021

531531
[*1]Gregory J. Roque, Appellant,
v
State of New York, Respondent.

Calendar Date:September 17, 2021

Before:Garry, P.J., Egan Jr., Lynch, Clark and Pritzker, JJ.

Mainetti & Mainetti, PC, Kingston (John T. Casey Jr., Troy, of counsel), for appellant.
Letitia James, Attorney General, Albany (Owen Demuth of counsel), for respondent.



Lynch, J.
Appeal from a judgment of the Court of Claims (Collins, J.), entered May 28, 2020, upon a decision of the court in favor of defendant.
In May 2017, claimant was seriously injured when his 2010 Harley Davidson Street Glide motorcycle struck a guide rail along State Route 23A in the Town of Catskill, Greene County. The accident occurred near the intersection of Route 23A and Old Kings Road after a motor vehicle turned left from Old Kings Road into claimant's travel lane. Taking evasive action, claimant passed the vehicle on the right, proceeded into the shoulder area and then collided with the guide rail. Claimant commenced this action seeking to recover for his injuries, claiming that defendant was negligent in, among other things, failing to maintain an adequate sight distance at the intersection, allowing the shoulder to contain a drop-off and an unpaved gravel section, and inappropriately placing a guide rail along this section of Route 23A.
Following a bench trial, the Court of Claims dismissed the claim. As to the drop-off between the paved and unpaved portions of the shoulder, the court emphasized that claimant was unable to identify the location where he encountered the condition and that the height differential between these two areas varied along the shoulder. Accordingly, the court held that the proof with respect to the drop-off was "inadequate to support a finding of liability." Furthermore, the court noted that claimant's motorcycle became unresponsive when he lost traction in the unpaved portion of the shoulder after he had already cleared the drop-off. As such, the court reasoned that the drop-off was not a proximate cause of the accident since "any effect [that] the change in elevation encountered by . . . claimant had upon the operation of his motorcycle had ceased prior to his actual loss of control." The court also rejected claimant's argument that defendant was negligent in permitting a portion of the shoulder to be unpaved,[FN1] emphasizing that he presented no evidence "that the use of gravel adjacent to a paved shoulder in a rural area such as the site of the accident herein was in any way inappropriate" or inconsistent with the "industry norms or customs" of the Department of Transportation (hereinafter DOT). In any event, given the lack of prior accidents at the subject location, the court found that claimant did not establish that defendant had actual or constructive notice of any danger posed by the unpaved portion of the shoulder. As to claimant's assertion that the placement of the guide rail was unwarranted, the court accepted the opinion of defendant's expert that the guide rail was appropriately installed to protect errant vehicles from a slope and culvert parallel to the highway and rejected the opinion of claimant's expert to the contrary. Finally, the court found that there was insufficient evidence to conclude that the sight distance at the intersection was a proximate cause of the accident. Claimant [*2]appeals.
Claimant argues that the decision of the Court of Claims is not supported by a fair interpretation of the evidence.[FN2] We disagree. "In reviewing a nonjury verdict on appeal, we have broad authority to independently review the probative weight of the evidence, while according appropriate deference to the court's credibility determinations and factual findings" (Driscoll v State of New York, 160 AD3d 1240, 1242-1243 [2018] [internal quotation marks and citations omitted]; see Burpoe v McCormick, 190 AD3d 1070, 1071 [2021]). Defendant "owes the public a nondelegable duty to maintain its roadways in a reasonably safe condition" (Schleede v State of New York, 170 AD3d 1400, 1401 [2019] [internal quotations marks and citation omitted]; see Friedman v State of New York, 67 NY2d 271, 286 [1986]). "This duty extends to conditions adjacent to [a] highway, and if [defendant] . . . undertakes to provide a paved strip or shoulder alongside the roadway, it must maintain that shoulder in a reasonably safe condition for foreseeable uses, including those uses resulting from a driver's negligence or an emergency" (Stiuso v City of New York, 87 NY2d 889, 891 [1995] [citation omitted]; see Bottalico v State of New York, 59 NY2d 302, 305-306 [1983]; Marrow v State of New York, 105 AD3d 1371, 1373 [2013]). "On the other hand, where the paved road surface is more than adequate for safe public passage, travel beyond those limits on unimproved land adjacent to the roadway is generally not contemplated or foreseeable and therefore [defendant] is under no duty to maintain it for vehicular traffic" (Stiuso v City of New York, 87 NY2d at 891 [internal quotation marks and citation omitted]).
Moreover, defendant is not an insurer of the safety of its roads and no liability will attach unless "[defendant's] alleged negligence in maintaining its roads in a reasonable condition is a proximate cause of the accident" (Steenbuck v State of New York, 111 AD3d 819, 819 [2013] [internal quotation marks and citations omitted]; see Redcross v State of New York, 241 AD2d 787, 789 [1997], lv denied 91 NY2d 801 [1997]). Additionally, no liability will inure in the absence of defendant's actual or constructive notice of the allegedly dangerous condition (see Gray v State of New York, 159 AD3d 1166, 1167 [2018]), unless defendant created the condition by its own affirmative acts of negligence (see O'Brien v City of Schenectady, 26 AD3d 655, 656 [2006], lv denied 7 NY3d 707 [2006]; Mercer v City of New York, 223 AD2d 688, 689-690 [1996], affd 88 NY2d 955 [1996]).
The trial evidence established that, on a clear, dry afternoon, claimant was driving his motorcycle in the westbound lane of Route 23A , a two-lane road with a 55 mile-per-hour speed limit. As he approached the intersection at Old Kings Road, he noticed a vehicle begin to turn left onto Route 23A into his traffic lane, estimating that it was between 75 and 100 feet away. Claimant testified that he blew his horn, [*3]hit the brakes and downshifted, but the vehicle stopped at a 45-degree angle in the middle of his traffic lane. Explaining that he had limited time to react, claimant passed the vehicle in the right-hand shoulder. He described the paved portion of the shoulder as "[d]eteriorated" and "very crumbled" and testified that, when he attempted to maneuver back to the travel lane, "the front right rim of [the] bike dipped off [of] a curb" onto the unpaved shoulder. The back wheel followed, producing a "jolt" and bringing his motorcycle completely within the unpaved area. Claimant indicated that he was driving around 30 or 35 miles per hour at that time. He further explained that, since the unpaved area contained loose gravel and asphalt, his bike "wasn't responsive" as he tried to maneuver back into the travel lane, describing the conditions as akin to driving "on a sandy beach." At some point, he struck a guide rail that ran parallel to the unpaved shoulder, travelled another 30 feet or so and eventually hit the ground near the intersection of Will Palmer Road. Referencing his 30 years of experience as a motorcycle rider, claimant averred that the condition of the shoulder was unsafe to ride a bike on. He conceded, however, that he did not know the precise location where he hit the drop-off, instead estimating a 30 to 40-foot area where this event might have occurred. Claimant did not use his antilock brakes to deaccelerate on the shoulder and a police-generated accident report indicated that he had been driving too fast for the conditions.
As to the condition of the shoulder, claimant relied on measurements taken by Andre Stuart, the chief executive officer of 21st Century Forensic Animations. Stuart used a laser scanner to measure the shoulder along Route 23A near the accident scene, revealing that the width of the paved portion spanned between 2 feet 6 inches and 3 feet 7 inches. Claimant also offered into evidence a series of photographs of Route 23A between the intersections of Old Kings Road and Will Palmer Road, which he testified accurately depicted the condition of the shoulder on the date in question. The pictures depict smooth asphalt in certain areas of the paved portion of the shoulder, and cracks, erosion and loose asphalt in other areas, particularly along the outer edge.
With respect to defendant's maintenance obligations over the shoulder, claimant called Stephen Clinton, DOT's acting regional director of operations, to testify. Clinton confirmed that DOT was responsible for maintaining Route 23A in the vicinity of the accident, from the center line of the highway to the outer edge of the paved portion of the shoulder. Clinton agreed that having a shoulder with a uniform width was generally sound highway design and relayed that "[i]deally . . . the shoulder would be uniform grade." He explained that "[t]he big concern" for DOT would be "any kind of drop-off between . . . the fog line" of the travel lane and the paved portion [*4]of the shoulder, and that the degree of concern would correlate with the height of the drop-off. Clinton noted that, under DOT's criteria, a two-inch drop-off at the fog line "would still be considered safe, but it would not be desirable," and a four-inch drop-off at that location would also be considered "reasonably safe" if the pavement had a rounded edge. When asked about the danger posed by a drop-off located in the middle of a shoulder, Clinton averred that such a condition would be cause for concern depending upon its proximity to the fog line, opining that a height differential of four inches "[a] foot and a half off" of the fog line would justify scheduling maintenance. As to the dangerousness of a drop-off at the "outside edge of a shoulder," Clinton maintained that a height differential of about six or seven inches would need to exist before DOT would be concerned enough to act.
Clinton testified that DOT's maintenance decisions with respect to the shoulder were tied to the expected use, explaining that a highway shoulder is intended to provide "lateral support for the travel lane" and agreeing that "evasive maneuvers during an emergency situation" were to be expected, but passing other vehicles was not. According to Clinton, DOT would take action to correct erosion on the paved portion of the shoulder depending upon its degree and location, with erosion on the outer edge being "less of a priority than closer to the travel lane." When shown a picture of the paved portion of the shoulder near the intersection of Old Kings Road, which appears to depict surface level cracks on the outer edge of the asphalt and erosion in certain areas, Clinton opined that it was "overall" safe for a motorcycle to take evasive maneuvers on. Clinton referred to the unpaved gravel area as "roadside" that was primarily used as a place to hold snow after winter plowing, averring that it was not formally part of the shoulder and was not expected to be traversed by vehicles. With respect to the guide rail, Clinton conceded that, as a fixed object on the side of the roadway, it was a potential hazard. However, he revealed that DOT's Highway Design Manuals (hereinafter the DOT manuals) permit the erection of guide rails to protect motorists from slopes adjacent to the highway depending upon their steepness.
Claimant also called John Serth, a civil engineer, to testify regarding highway design and maintenance. Serth explained that highway shoulders provide lateral stability for the road and serve as a place for "errant vehicles" to take "evasive maneuvers in an extreme situation." Serth took measurements of the drop-off on the relevant stretch of shoulder in 50-foot increments and his photographs reveal that it spanned between 2½ and 7 inches in height from the edge of the paved shoulder to the outside part of the unpaved area — i.e., there was not an immediate drop-off of seven inches at the transition part of the paved/unpaved shoulder. Serth opined [*5]that the drop-off "should not have been there." As to the shoulder design, he testified that it was dangerous given the existence of the unpaved area, noting that there was previously a homogeneous paved shoulder all the way up to a guide rail.[FN3] Serth testified that DOT's guidelines generally required DOT to extend shoulder pavement six inches beyond the back side of any guide rails adjacent to a highway, relying on the DOT manuals from 1973 and 1980. However, the relevant excerpts from the DOT manuals indicate that, rather than mitigating potential safety hazards posed by unpaved shoulders, this requirement was intended to "eliminate the need for mowing under the guide rail," with Serth also expressing as much during his testimony. Serth further opined that a guide rail was not warranted at the subject location because the slope adjacent to the shoulder was not steep enough as contemplated in the DOT manuals.
Claimant's accident reconstruction expert, John McManus, testified that a drop-off of between three and five inches on a highway shoulder "would be a destabilizing influence" on a motorcycle and that, upon hitting gravel, there would be a "much lower coefficient of friction" upon which to maneuver back to pavement. Although McManus opined that the shoulder was not safe for a motorcycle to operate on and that the drop-off contributed to the accident, he conceded that he was unable to reconstruct the accident given the absence of physical evidence establishing the point where claimant hit the drop-off or struck the guide rail. He also acknowledged that the jarring effect on a motorcycle from hitting a drop-off would vary depending upon its height. McManus acknowledged that, although claimant could not have come to a complete stop upon observing the motor vehicle between 75 and 100 feet away, he could have slowed down significantly.
Defendant, in turn, called Dominick Gabriel — a civil engineer who previously worked for DOT — to testify on its behalf. Gabriel inspected the accident area, noting that the unpaved portion of the shoulder was made of select granular fill and was meant to provide a "clear area" as well as a place for errant vehicles to recover before hitting the guide rail. He maintained that select granular fill was an appropriate material to use in this location, noting that it was not meant to be a driving area. Gabriel testified that, when the highway was resurfaced in 1990, DOT was not required to pave the entire area from the fog line up to the guide rail, averring that the section of DOT's 1980 manual that Serth had relied upon pertained only to four and six-lane highways. Gabriel also confirmed that the guide rail was installed in 1990 due to a slope and culvert adjacent to the highway, opining that it was required under DOT guidelines. Gabriel questioned the accuracy of Serth's measurements of the drop-off, explaining that Serth failed to place his level flush against the edge of the paved shoulder and, therefore[*6], did not follow its slope. Although Gabriel conceded that the drop-off was not reasonably safe for a motorcycle traveling at 40 miles per hour, he testified that, if claimant had decelerated "as you're supposed to be" when a vehicle is "breaking down or . . . errant," then the condition "would [have] be[en] fine."
As to defendant's actual or constructive notice of the alleged dangerous conditions, defendant elicited testimony from Mark Pyskadlo, a civil engineer for DOT who reviewed accident history data from the relevant portion of Route 23A spanning back five years from May 2017. No prior accidents had been reported in relation to the paved and/or unpaved shoulder or the guide rail during this period. Although DOT undertook a site distance study at the Old Kings Road intersection in response to community complaints received in 2001 and 2002, the complaints did not concern the condition of the shoulder. Moreover, accident history data pulled in connection with the 2001 study did not identify any accidents pertaining to the guide rail or shoulder.
On this record, we find no basis upon which to disturb the determination of the Court of Claims. Initially, we reject claimant's argument that certain remedial measures undertaken by defendant subsequent to the accident support a finding that the shoulder was previously maintained in a dangerous condition. To the extent this argument is preserved, proof of subsequent remedial measures is generally inadmissible to prove negligence (see Caprara v Chrysler Corp., 52 NY2d 114, 122 [1981]; Greblewski v Strong Health MCO, LLC, 161 AD3d 1336, 1337 [2018]). As for the drop-off, although Serth opined that it was a dangerous condition — with the record indicating that it measured between 2½ and 7 inches in height — Gabriel called into question the accuracy of Serth's measurements due to his failure to place his level flush against the slope of the drop-off, and the height differential varied along the relevant portion of the shoulder. Given the varying height differential of the drop-off and the lack of specific information about where claimant encountered it, the conclusion of the Court of Claims that claimant did not demonstrate defendant's liability with respect to this condition is supported by the record (see Marrow v State of New York, 105 AD3d at 1373 [2½-inch drop-off in the middle of the shoulder was not an unreasonably dangerous condition]; see generally Brooks v New York State Thruway Auth., 73 AD2d 767, 768 [1979], affd 51 NY2d 892 [1980]).[FN4]
That said, we do not agree with the Court of Claims' explanation that the height differential was of no consequence since "any effect the change in elevation encountered by . . . claimant had upon the operation of his motorcycle had ceased prior to his actual loss of control." This accident sequence was only a matter of seconds and should be viewed in a continuum rather than in a bifurcated manner. Claimant explained that, after passing the car as he[*7]"started [his] lean to come back, re-correct and get back on the road, the front right rim of [his] bike dipped off [of] a curb . . . follow[ed] by . . . the rear tire, and it was like . . . a washed out streambed, just like trying to control a bike on a sandy beach." When the court inquired as to where the "loss of control" began, claimant explained that "[t]he true loss of control" occurred when both tires left the paved shoulder. Claimant explained that, once on the unpaved shoulder, he "did try to lean the bike, and it gets very squirrely, so [he] straightened the bike up, and then immediately was sucked into the guardrail by the debris." From this account, we conclude that the height differential was a contributing factor in that claimant was unable to transition from the unpaved shoulder back to the road.
The operative question thus becomes whether defendant was negligent in utilizing a partially unpaved shoulder and/or in maintaining the same. We recognize that both Serth and McManus testified that the unpaved gravel shoulder produced a lower coefficient of friction for a motorcycle to maneuver on — with Serth opining that it "should not have been there" and that this area was "not properly maintained." However, Gabriel testified to the contrary, opining that select granular fill was appropriate for this location, there was no requirement that DOT pave the entire area from the fog line to the guide rail and the paving requirements cited by Serth either did not apply in these circumstances or were not intended to mitigate safety hazards. In our view, the Court of Claims could reasonably accept Gabriel's testimony on this issue and conclude that claimant did not sufficiently demonstrate that paved shoulders constitute the standard of care (see Hanley v City of New York, 139 AD3d 800, 802 [2016]; Chunhye Kang-Kim v City of New York, 29 AD3d 57, 61 [2006]).
In any event, there were no prior accidents attributable to the shoulder, and claimant did not demonstrate that defendant was aware of any dangerous condition or that its inspection procedures in the relevant vicinity were unreasonable (see Fowle v State of New York, 187 AD2d 698, 699 [1992]; compare Rockenstire v State of New York, 135 AD3d 1131, 1132-1133 [2016]). As to constructive notice, the Court of Claims' determination that claimant's proof on this issue was inadequate is warranted by the record (see Gordon v American Museum of Natural History, 67 NY2d 836, 837-838 [1986]; Rubio v State of New York, 168 AD3d 892, 893 [2019]; Goldblatt v State of New York, 72 AD2d 886, 887 [1979]). Moreover, claimant's argument that notice of the allegedly dangerous conditions of the shoulder was not required in these circumstances is unavailing. The exception upon which he relies applies only where the dangerous condition was created through defendant's own affirmative acts of negligence — a proposition for which the proof is lacking (see Mercer v City of New York, 223 AD2d at 689-690; Rogers [*8]v Town of Ramapo, 211 AD2d 775, 776 [1995]).
As for the guide rail, defendant's duty to maintain its roadways in a reasonably safe condition includes "maintain[ing] adequate and proper barriers along its highways" (Gomez v New York State Thruway Auth., 73 NY2d 724, 725 [1988]; see Fu v County of Washington, 144 AD3d 1478, 1479 [2016]; Ferguson v Sheahan, 71 AD3d 1207, 1208 [2010]), which may encompass the "installation of guide rails when necessary" (Schroeder v State of New York, 145 AD3d 1204, 1205 [2016], lv denied 29 NY3d 914 [2017]). To that end, "a steep slope or a ditch may be so inherently dangerous that a municipality has a duty to prevent vehicles from leaving the road or, if they do, to eliminate the danger" (Madden v Town of Greene, 64 AD3d 1117, 1119 [2009] [internal quotation marks and citations omitted]). The credible evidence established that the guide rail was erected to protect motorists from a slope and culvert adjacent to the highway. Although Serth and Gabriel disagreed about whether the slope was steep enough to warrant the installation of a guide rail under DOT's standards, it was the province of the Court of Claims to resolve this conflict and it could reasonably accept Gabriel's opinion on this issue (see Gibbs v Porath, 145 AD3d 1221, 1222-1223 [2016], lv denied 29 NY3d 906 [2017]; Marrow v State of New York, 105 AD3d at 1373-1374). Claimant's remaining contentions, to the extent not expressly addressed herein, have been considered and found lacking in merit.
Garry, P.J., Egan Jr., Clark and Pritzker, JJ., concur.
ORDERED that the judgment is affirmed, without costs.



Footnotes

Footnote 1: There was a dispute at trial as to whether the unpaved area where claimant lost traction was part of the shoulder adjacent to Route 23A. The Court of Claims found that it was and we agree.

Footnote 2: Claimant does not challenge the Court of Claims' finding that the sight distance at the subject intersection was not a proximate cause of the accident, thereby abandoning any argument in this regard (see Matter of O'Flaherty v MRZ Trucking Corp., 194 AD3d 1205, 1207 n [2021]).

Footnote 3: Serth noted, however, that the original plans called for a soil shoulder.

Footnote 4: We also note that claimant's own expert failed to substantiate the assertion that the drop-off was an unsafe condition. Although Clinton noted certain dangers posed by drop-offs along highways, his main focus was directed at drop-offs located at the fog line. To that end, he conceded that even a four-inch drop-off at that location would be considered "reasonably safe" if the pavement had a rounded edge. As for the danger posed by drop-offs located in the middle of a shoulder, Clinton averred that such a condition would be cause for concern depending upon its proximity to the fog line, opining that a height differential of four inches "[a] foot and a half off" of the fog line would justify maintenance. Here, however, the drop-off was located more than a foot and a half off of the fog line. Defendant's expert also questioned the proposition that the drop-off was an unsafe condition, testifying that, if claimant had decelerated as expected then the condition "would [have] be[en] fine." In these circumstances, the Court of Claims reasonably concluded that claimant did not satisfy his burden of proof with respect to the drop-off (cf. Marrow v State of New York, 105 AD3d at 1373; Ball v State of New York, 106 AD3d 1248, 1249 [2013]).