M.K. v State of New York (2023 NY Slip Op 03268)

M.K. v State of New York

2023 NY Slip Op 03268

Decided on June 15, 2023

Appellate Division, Third Department

McShan, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:June 15, 2023

534706

[*1]M.K., Respondent,
v
State of New York, Appellant.

Calendar Date:May 2, 2023

Before: Aarons, J.P., Pritzker, Reynolds Fitzgerald, Fisher and McShan, JJ.

Letitia James, Attorney General, Albany (Sean P. Mix of counsel), for appellant.
Sivin, Miller & Roche, LLP, New York City (Clyde Rastetter of counsel), for respondent.

McShan, J.
Appeals (1) from a decision of the Court of Claims (Catherine C. Schaewe, J.), entered November 18, 2021, following a bifurcated trial in favor of claimant on the issue of liability, and (2) from the judgment entered thereon.
Claimant commenced this action to recover for injuries suffered while he was an incarcerated individual at the Elmira Correctional Facility (hereinafter ECF), operated by defendant. Specifically, claimant asserted, as relevant here, that two unidentified correction officers, employees of the Department of Corrections and Community Supervision (hereinafter DOCCS), humiliated and degraded claimant during the course of a mandatory strip frisk and placement in an observation cell. Defendant answered and asserted various affirmative defenses, including that it was not liable for the actions of the correction officers that fell outside of the scope of their employment. Following a bifurcated nonjury trial on the issue of defendant's liability, the Court of Claims issued a decision finding defendant liable for the actions of the correction officers during the strip frisk.[FN1] Thereafter, the court entered an interlocutory judgment and scheduled a trial on the issue of damages. Defendant appeals from the decision and the judgment.
Under the doctrine of respondeat superior, an employer "may be held vicariously liable for torts, including intentional torts, committed by employees acting within the scope of their employment" (Rivera v State of New York, 34 NY3d 383, 389 [2019]). The same is true whether the acts of the employee are negligent or intentional so long as such acts are "a natural incident of the employment" (id. [internal quotation marks and citation omitted]). "In determining whether an employee was acting within the scope of his or her employment for purposes of vicarious liability, [this Court] look[s] to several factors, including the connection between the time, place and occasion for the act; the history of the relationship between employer and employee as spelled out in actual practice; whether the act is one commonly done by such an employee; the extent of departure from normal methods of performance; and whether the specific act was one that the employer could reasonably have anticipated (i.e., whether it was foreseeable)" (Galloway v State of New York, 212 AD3d 965, 966 [3d Dept 2023] [internal quotation marks and citation omitted]; see Riviello v Waldron, 47 NY2d 297, 303 [1979]).
"When reviewing a nonjury verdict, this Court has broad authority to independently review the probative weight of the evidence, but we generally defer to the trial court's credibility determinations and factual findings, as that court had the opportunity to observe the witnesses" (McFadden v State of New York, 200 AD3d 1357, 1357 [3d Dept 2021] [internal quotation marks and citations omitted]; see Howell v State of New York, 169 AD3d 1208, 1209 [3d Dept 2019], lv denied 33 NY3d 907 [2019]). Here, the Court of Claims credited claimant's [*2]account of the events precipitating his claim, which occurred in the early days of his incarceration at ECF. According to claimant, on the date of the incident, he alerted a nearby correction officer that he was feeling "overwhelmed" after learning that he would not be eligible for a shock incarceration program. After speaking to a mental health worker, he was escorted by one officer to the ECF medical building, where they were joined by a second officer.
At this point, both officers began asking claimant about his conviction and whether "[he] was into little kids." According to claimant, the officers then started hitting him for "[p]robably less than a minute," before they arrived at the observation cell. At that point, the officers ordered claimant to remove his clothing so that they could conduct a strip frisk. Claimant was first instructed to run fingers through his hair, which he did, and then he was instructed to run his fingers through his gums, to which he also complied. The officers then ordered claimant to lift his genitalia; however, after claimant had done so, the officers told him to run his fingers through the gums again. Claimant briefly hesitated to comply, but eventually did so after one of the officers approached him. Claimant testified that this made the officers "chuckle a little." Then the officers ordered claimant to lift his testicles again and told him to spread them more, causing claimant some discomfort, before again ordering him to run his fingers through his gums. The officers made him repeat the process once more before ordering claimant to bend over and spread his buttocks, at which point the officers directed him "to stick [his] finger in [his] anus so that they could make sure there was nothing in there." After complying with that order, the officers again directed claimant to run his fingers through his gums. Claimant was then seen by the nurse, after which the officers brought him back to the observation cell and told him to keep quiet about everything that the officers did "or else they were going to make it look like a suicide." Before leaving the cell, the officers ordered claimant to lie down on the mat on the floor, at which point one of the officers "[n]udged [claimant's] genitals under [his] smock[,] put his boot on [claimant's] chest and leaned over while grabbing himself," telling claimant to "think about this next time."
At trial, the parties stipulated to the admission of DOCCS' Directive No. 4910 (hereinafter the directive), which, among other things, provided the official process for strip frisking of incarcerated individuals. Notably, the directive explicitly states that "[i]n performing a strip search or strip frisk, [o]fficers shall conduct themselves professionally. Officers shall be alert to the sensitive nature of the strip search or strip frisk and conduct such searches in a manner least degrading to all involved." As relevant here, the directive required that a male incarcerated individual[*3]"lift[ ] his testicles to expose the area behind his testicles, and bend[ ] over and spread[ ] his buttocks to expose his anus to the frisking" correction officer. Defendant also presented the testimony of a correction officer who was stationed in the infirmary on the day in question but was not one of the two officers involved in the preceding events. Although the officer had no recollection of seeing claimaint on the day in question, he confirmed the manner in which a strip frisk would be administered when an incarcerated individual was placed on a one-on-one watch.
There can be little dispute that the employee-employer relationship, time, place and manner and the common nature of the strip frisk and placement in the observation cell, which was mandatory under the circumstances, are established by the record. Accordingly, as is frequently the case in matters involving the actions of correction officers occurring in correctional facilities, defendant's contentions on appeal are directed toward the extent that the conduct may have departed from the correction officers' regular duties and the foreseeability of the alleged deviation (see generally Rivera v State of New York, 34 NY3d at 386, 389; Galloway v State of New York, 212 AD3d at 966; McFadden v State of New York, 200 AD3d at 1359). Specifically, the crux of defendant's contention in this matter is that the correction officers' conduct during the strip frisk and placement was motivated solely by personal animus, which inherently rendered such conduct outside the scope of employment. We are unpersuaded.
The law is well established that intentional torts may still fall within the scope of employment, and the motivation for such conduct is not dispositive as to defendant's liability; rather, that factor is but one of several for our consideration pertaining to whether such acts were foreseeable as "a natural incident of the employment" (Rivera v State of New York, 34 NY3d at 389 [internal quotation marks and citation omitted]; see Riviello v Waldron, 47 NY2d at 304). Said differently, "where the element of general foreseeability exists, even intentional tort situations have been found to fall within the scope of employment" (Riviello v Waldron, 47 NY2d at 304; see Galloway v State of New York, 212 AD3d at 966). Although the correction officers' actions may have been motivated in part by an intent to humiliate claimant, we disagree with defendant's assertion that such intent was the sole motivation for each of the commands and that such actions were undertaken without any furtherance of defendant's business (compare Judith M. v Sisters of Charity Hosp., 93 NY2d 932, 933 [1999]). In this respect, the preponderance of the acts performed during the strip frisk and placement into observation did not significantly deviate from the mandates of the directive and were in fact required prior to claimant's confinement in one-on-one observation. What rendered the incident demeaning, and the reason that [*4]claimant has a viable claim, is the product of the sequence in which those acts occurred. Moreover, the potential for such conduct is precisely that which was foreseen in the warnings contained in the directives, which instructed those officers conducting a strip frisk to be mindful of the sensitive nature of the search and to conduct themselves "in a manner least degrading to all involved."
In considering the motivation of the officers under these circumstances, we note that the underlying conduct in this case readily differs from those concerning sexual assault, which would not be permitted conduct under any instance and, thus, would constitute "a clear departure from the scope of employment" (Doe v Heckeroth Plumbing & Heating of Woodstock, Inc., 192 AD3d 1236, 1238 [3d Dept 2021] [internal quotation marks and citations omitted]; see Judith M. v Sisters of Charity Hosp., 93 NY2d at 933). Rather, the motivation of the officers and the resulting conduct, while clearly a despicable and perverse undertaking of the allowable procedures provided in the directive, was not undertaken solely to humiliate claimant and, therefore, was part and parcel of the employment-related function of administering a strip frisk. In doing so, we note that the principles concerning the use of excessive force are equally applicable to the actions undertaken here, which "clearly crossed the line of sanctioned conduct, [but] cannot be readily divorced from "the authorized strip frisk that the officers were engaged in (Galloway v State of New York, 212 AD3d at 968 [internal quotation marks, brackets and citation omitted]; see Siriani v State of New York, 72 Misc 3d 1211[A], *6 [Ct Cl 2021]; compare Rivera v State of New York, 34 NY3d at 389). In sum, we agree with the Court of Claims determination that defendant was liable for the correction officers' conduct pertaining to the strip frisk and placement in the one-on-one observation cell and we therefore affirm.[FN2]
Aarons, J.P., Pritzker, Reynolds Fitzgerald and Fisher, JJ., concur.
ORDERED that the appeal from the decision is dismissed, with costs.
ORDERED that the judgment is affirmed, with costs.

Footnotes

Footnote 1: Claimant also alleged that the officers physically assaulted him while escorting him to a mental health observation cell. However, claimant, did not appeal from the judgment and, as such, his objection to the Court of Claims' dismissal on that issue is not properly before us (see Hecht v City of New York, 60 NY2d 57, 61-62 [1983]; Maddux v Schur, 103 AD3d 1066, 1066 n 2 [3d Dept 2013]).

Footnote 2: Defendant's appeal from the underlying decision is dismissed as "a decision is not an appealable paper and[, in any event,] the appeal from the judgment includes review of the underlying decision" (Howell v State of New York, 169 AD3d at 1209 n 1 [internal quotation marks and citation omitted]; see CPLR 5512 [a]).