Englander v State of New York (2025 NY Slip Op 01685)

Englander v State of New York

2025 NY Slip Op 01685

Decided on March 20, 2025

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:March 20, 2025

CV-23-0803
[*1]Matthew Englander, Appellant,
v
State of New York, Respondent.

Calendar Date:January 6, 2025

Before:Garry, P.J., Pritzker, Ceresia, Powers and Mackey, JJ.

Buttafuoco & Associates PLLC, Woodbury (Ellen Buchholz of counsel), for appellant.
Letitia James, Attorney General, Albany (Frederick A. Brodie of counsel), for respondent.

Pritzker, J.
Appeals (1) from a decision of the Court of Claims (W. Brooks DeBow, J.), entered March 30, 2023, in favor of defendant, and (2) from a judgment entered thereon.
This appeal involves an accident on State Routes 44/55 in the Town of Gardiner, Ulster County. After driving westward up a mountain on Routes 44/55 to visit a local scenic site, claimant crashed into a rock wall while navigating a hairpin turn around 1:00 a.m. as he drove eastward down the mountain. Claimant brought an action against defendant to recover for his injuries. After a nonjury trial, the Court of Claims found defendant not liable for claimant's injuries because, among other things, defendant reasonably maintained the roadway near the hairpin turn. Claimant appeals.[FN1]
Claimant argues that the verdict is against the weight of the evidence because defendant's negligence and breach of duty were the proximate cause of the accident. We disagree. "In reviewing a nonjury verdict on appeal, we have broad authority to independently review the probative weight of the evidence, while according appropriate deference to the court's credibility determinations and factual findings" (Roque v State of New York, 199 AD3d 1092, 1094 [3d Dept 2021] [internal quotation marks and citations omitted]; see Scheuer v State of New York, 198 AD3d 1225, 1229 [3d Dept 2021]). As relevant here, defendant has a duty to keep its roadways and their shoulders in a reasonably safe condition (see Wittorf v City of New York, 23 NY3d 473, 480 [2014]; Roque v State of New York, 199 AD3d at 1094).
Claimant testified at trial that, on the day of the accident, he worked from 8:30 a.m. to 7:30 p.m. and then went from work to a friend's house, where he watched football. He explained that he fell asleep at the friend's house and woke up around midnight. After leaving his friend's house, claimant decided to drive to a local scenic site known as "the lookout," to which he had never been before. Claimant reached the lookout, where he stayed, alone, looking at the stars, and then he drove back down the same road that he had driven up. As he drove down the road, he "hit the mountain wall" near the hairpin turn. Claimant testified that he did not see the hairpin turn because "it was so sudden" and "super dark." Claimant admitted that he did not see a sign warning drivers to reduce their speed or notice that his car was leaving the road before it hit the mountain. Claimant testified that, had there been reflectors on the hairpin turn, he would have been "more awake — more alert." During cross-examination, defendant's attorney inquired about claimant, at his deposition, having testified that he did not recall how the accident occurred and then, at trial, explained that, in the extra two years between his deposition and trial, he had time to remember — despite the deposition having been four years after the accident. Additionally, claimant testified at trial that he was going 30 miles per hour right before the accident, but he testified [*2]at his deposition that he did not recall what speed he was driving. Claimant conceded that there was a sign indicating drivers should drive 30 miles per hour on a turn prior to the hairpin turn and that, right before the hairpin turn, there is a yellow sign with a 180-degree arrow indicating drivers should go five miles per hour down the hairpin turn. Claimant also conceded that there is a white reflective marker on the turn.
Claimant read portions of Mark Murano's deposition into evidence. Murano, an engineer for defendant, testified that he was not aware of any investigations relative to the hairpin turn. Murano was familiar with the hairpin turn, but he was not aware that there were accidents on it over the years. Murano explained that someone would check the roadways and signs in a drive-by inspection once or twice every two weeks. Claimant also read the deposition testimony of David Corrigan, the acting resident engineer for defendant, into evidence. Corrigan testified that he oversaw all road maintenance activities for state roads in Ulster County. Corrigan conducted some road studies, which would include checking signage and ensuring signs were in good repair. Corrigan inspected the roadway where the crash happened before his deposition and found that the sign warning of the hairpin turn was 375 feet before the beginning of the hairpin turn. The warning sign was "retroreflective, which means, it directs the light right back from the direction that it came from." Corrigan testified that previous accidents on the hairpin turn were, in his opinion, likely related to weather issues, as this stretch of road is on a steep hill.
Finally, claimant called Thomas Mazzola, an engineer, who testified that defendant received a complaint from a driver about the hairpin turn in 2005, which, in his opinion, should have prompted it to do an investigation. Mazzola also testified that the accident rate in the vicinity was more than double the rate for roads similar to it in the state, which indicated there was an issue with this roadway and it should have been investigated. However, on cross-examination, Mazzola conceded that the number of biannual accidents near the hairpin turn would not trigger an investigation into its safety, per state guidance. Mazzola looked into these previous accidents, and he found there were numerous accidents where the vehicle drove off the road near the hairpin turn, however the majority of those accidents involved vehicles going up the mountain, rather than down it, as claimant was. Mazzola testified that he inspected the site and thought there should be guiderails. He found that conditions on the road were not in compliance with the federal manual used by traffic engineers and government agencies. Mazzola explained that, as the recommended speed on the hairpin turn was five miles per hour and the normal speed limit was 55 miles per hour on that road, the hairpin turn should have had chevrons (V-shaped symbols) and arrows indicating [*3]when the lower speed applied.[FN2] However, here, the hairpin turn had no chevron markings. Mazzola did concede that, if these signs had been installed before 2009, an earlier edition of the federal manual would apply and chevrons would be optional, rather than mandatory. Mazzola also testified that the five mile-per-hour sign before the hairpin turn appeared to be lower than five feet above the ground, the minimum height suggested in the federal manual. Although the reflectiveness of signs can last up to 50 years, Mazzola testified that defendant should have tested the signs to ensure they remained reflective. Painted lines on roads do not last as long, but Mazzola did say the painted lines near the hairpin turn were viewable in the daytime photographs taken before the accident. Mazzola found it "unusual" that defendant did not have records of when it last painted the lines on the road near the hairpin turn. Ultimately, Mazzola testified that it was his opinion that the lack of a guiderail and chevrons proximately caused the accident.
Claimant submitted many exhibits, including photos of Routes 44/55 going east down the mountain, the police report for this accident, an accident report summary for the area and police reports for each accident. This summary reveals that, from November 2000 to December 2016, there were 45 accidents. Only five of these accidents involved drivers who travelled in the eastbound, down-mountain direction that claimant went — April 2002, October 2004, February 2012, March 2013 and May 2015. The April 2002 crash involved a vehicle that failed to reduce its speed for the hairpin turn. The October 2004 accident report indicates that the driver swerved to avoid hitting a vehicle that was driving in oncoming traffic. The road was icy when the February 2012 crash happened, and the summary report says the driver was speeding. The March 2013 accident involved the driver crossing the divider while turning and crashing into a guiderail. The May 2015 police report indicates that the driver was unfamiliar with the area and was unable to navigate the turn in rainy conditions.
For its part, defendant called Corrigan, who testified to much of what claimant read into the record from his deposition. Corrigan also explained that the local Department of Transportation staff check annually that the reflectivity of signs is working by sending staff around state roads after the sun goes down, typically in the winter months. Additionally, Corrigan explained that the painted lines on the road near the hairpin turn had a reflective quality. Robert Eggering, a state trooper, testified that he responded to the scene around 1:40 a.m. and found claimant lying prone on the ground next to the driver's side of his vehicle, which had gone off the roadway. Claimant did not give any information about what happened and, while investigating the scene to determine the cause of the accident, Eggering did not observe any skid marks or yaw marks, which are left by [*4]a car when it slides. Eggering testified that it was not raining, and the roads were dry. Eggering explained that, based upon his investigation, due to the lack of braking marks, he did not believe that there was any "outside contributing factor" to the accident. Eggering, in his police report, noted that claimant being "[f]atigued or drowsy" was a contributing factor to the accident. Defendant also called claimant, who testified that he stood outside his car for some of the 30 to 45 minutes he spent at the lookout and then drove "approximately" 30 miles per hour down the mountain before crashing. He testified that he was not familiar with the speed limit, but that he "probably saw" that it was 30 miles per hour. However, he later testified that he did not recall seeing a 30 mile-per-hour speed sign. Claimant explained that he drove down the mountain with his low-beam lights on, which were sufficient for him to see on his drive up the mountain. Claimant testified that he negotiated the turns in the road prior to the hairpin turn by following "[t]he curvature of the road [and] rock wall" and did not "necessarily" follow the line in the middle of the road because it was dark. Claimant stated that he did not recall leaving his lane of travel.
Dominick Gabriel, an engineer, testified that he measured relevant markings near the hairpin turn, and the five mile-per-hour sign was approximately seven inches too low, but that it cleared the guiderail on the side of the road. Gabriel testified that, contrary to Mazzola's opinion, defendant did not need to install a guiderail on the hairpin turn and that, for a vehicle coming down the hill, a guiderail would increase the severity of an accident. Gabriel testified that he measured and found that the five mile-per-hour sign was approximately 364 feet before the beginning of the hairpin turn. Gabriel disagreed with Mazzola about which version of the federal manual applied to this sign because new versions do not apply retroactively. Ultimately, Gabriel opined that the road was properly maintained, with adequate warnings and signage. Gabriel conceded, however, that the state manual lists installing guiderails as a "general countermeasure for fixed object collisions," which is the kind of collision that occurred in this case. He also conceded that defendant received a 2005 letter from a citizen who drove down the hairpin turn at night and claimed to almost get into an accident because she could not see it, yet there is no evidence that letter prompted an investigation. Additionally, defendant submitted a portion of the federal manual indicating that chevrons were optional in the 2003 version that applied when defendant installed the signage that is near the hairpin turn. It also submitted the 2009 version of the manual — although this version mandates the use of chevrons on hairpin turns, it also set a compliance date of December 31, 2019, more than three years after the accident.
Given the foregoing, we do not [*5]discern any basis to disturb the determinations and findings of the Court of Claims that defendant did not breach its duty to maintain the roadway in a reasonably safe condition. Claimant asserts that defendant did not maintain the roadway in a reasonably safe condition because there was no guiderail on the opposite side of the road nor chevrons before the hairpin turn. We disagree. First, claimant's argument that a 2009 version of the federal manual requires chevrons in situations like this does not mean that the failure to install signs near the hairpin turn prior to the 2019 compliance date was negligent (see Madden v Town of Greene, 64 AD3d 1117, 1119-1120 [3d Dept 2009]; Vizzini v State of New York, 278 AD2d 562, 563 [3d Dept 2000]). Moreover, even though a guiderail or chevrons may have made the hairpin turn safer, only reasonable care and foresight, not perfect safety, is required (see Tomassi v Town of Union, 46 NY2d 91, 97-98 [1978]). Indeed, defendant had installed the retroreflective sign warning of the hairpin turn approximately 375 feet in advance of the curve, and the sign was checked every few weeks for its reflectivity. There was also a white reflective marker on the hairpin turn, and the markings on the road were reflective. Further, although there had been accidents near the hairpin turn, the majority of those accidents occurred in the upward mountain, westward direction. Of those accidents that occurred in the same direction that claimant was travelling, none involved conditions like the accident here — each involved driver error, poor road conditions or a vehicle coming from the opposite side that claimant came from, or a combination of those factors — so there was no notice to defendant of any dangerous condition near the hairpin turn (see generally Grasse v State of New York, 228 AD3d 1028, 1031 [3d Dept 2024]). As such, we agree with the Court of Claims determination that, here, defendant exercised reasonable care and therefore did not breach its duty. Given this determination, claimant's remaining contentions have been rendered academic.
Garry, P.J., Ceresia, Powers and Mackey, JJ., concur.
ORDERED that the appeal from the decision is dismissed, without costs.
ORDERED that the judgment is affirmed, without costs.

Footnotes

Footnote 1: Claimant's appeal from the underlying decision must be dismissed, as "a decision is not an appealable paper and, in any event, the appeal from the judgment includes review of the underlying decision" (M.K. v State of New York, 216 AD3d 139, 145 n 2 [3d Dept 2023] [internal quotation marks, brackets and citations omitted]; see CPLR 5512 [a]).

Footnote 2: The photographs of the hairpin turn and stretches of roadway near it are dated July 22, 2016, about four months before the accident.